[Crim. No. 6461. Third Dist. Apr. 21, 1972.]

In re ARCHIE HENDERSON et al. on Habeas Corpus.

## COUNSEL

Patti Roberts, Richard M. Doctoroff, Garry, Dreyfus, McTernan & Brotsky, Charles R. Garry, Allan Brotsky and W. Thomas Jennings for Petitioners.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James and Doris H. Maier, Assistant Attorneys General, Nelson P. Kempsky and Anthony L. Dicce, Deputy Attorneys General, for Respondent.

## OPINION

**RICHARDSON, P. J.**—Petitioners, seeking a writ of habeas corpus, allege that they are unlawfully confined at Folsom State Prison and restrained of their liberties in violation of the First, Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution. They allege that officials of the prison and of the Department of Corrections have punished a number of prisoners, predominantly black, but chicano and white as well, by removing them from the general prison population and placing them in punitive segregation and disciplinary units, such as Unit 1-C and the adjustment center, 4-A, within the prison. This has been done, according to petitioners, not only at Folsom but at other prisons throughout the state, as a means of punishment for alleged political beliefs, as well as for their "association with radical prisoners" and their involvement in an alleged plot to overthrow the prison system.

The effect of this segregation, petitioners assert, is to deprive them of their regular vocational and educational programs, to confine them in small cells for 24 hours per day without proper medical care or attention, to deny to them any meaningful rehabilitation or normal contact with other human beings and either to deny them parole dates or to forfeit parole dates already granted.

This conduct by prison officials, according to petitioners, constituted a serious overreaction to a number of incidents commencing with an episode

on August 21, 1971, at San Quentin Prison, wherein George L. Jackson, a black prisoner, two white prisoners and three prison guards were killed. This was followed on September 16, 1971, by the killing of Ronald L. Turner, a civilian laundry employee at Folsom, after which the prisoner population of Folsom was locked in their cells for one week and many prisoners were subjected to roundup and confinement in the maximum security area. These latter, predominantly black inmates, it is claimed, were chosen because of their political "militancy" and radical views, their contact with attorneys or organizations associated inside and outside the prison with political causes, or their associations with other prisoners thought to be "militant," and for alleged or actual membership in the Black Panther Party. Such confinement, it is asserted, lacked any procedural safeguards, including right to counsel, notice, right of confrontation, access to records and other related constitutional guarantees. Certain drastic restrictions and limitations on the activities of the petitioners as an incident of their confinement are alleged, including unreasonable searches and seizures of their property and denial of the right of privacy.

Petitioners seek a writ of habeas corpus to test the legality of their confinement, an order to divulge to petitioners' counsel petitioners' cumulative file and other Department of Corrections documents and records, an order to return petitioners to the general prison population, or, alternatively, to hold a full evidentiary hearing to inquire into the disputed facts, and an order directing respondent to expunge from petitioners' records all reports concerning the lockup.

In summary, petitioners claim that without having been charged with violation of any prison regulation and without a hearing—and because either they or their associates hold militant political views with which the prison officials do not agree—they were confined in very small cells with inadequate light, given poor food, deprived of educational or vocational programs, deprived of adequate exercise and medical attention, permitted only limited visitation and subjected to rigid censorship.

The petition is supported by a series of declarations of petitioners and their attorneys, and certain miscellaneous writings.

To these charges the respondent has answered with a return constituting a denial that the confinement of the petitioners was punishment, but alleging, rather, that it was intended "to abort any prison takeover which might be in the making and to prevent any further violence." The return is supported by the affidavit and supplemental affidavit of Walter E. Craven, Warden of Folsom Prison, together with affidavits of officials of the Depart-

ment of Corrections stationed at Folsom, officers of the Adult Authority and miscellaneous institutional records pertaining to petitioners.

Respondent's position, briefly summarized, is as follows: Folsom is a maximum security institution whose purposes include treatment and control of inmates requiring greater than usual custodial restraint, habitual criminals, those serving long sentences, and those difficult to manage who are threats to the safety and order of other institutions. Following the death of George Jackson at San Quentin in August 1971, correctional officers at Folsom informed the warden of an increase in tension and unease among the inmate population. A correctional officer informed the warden that an ex-inmate reported rumors of a planned overthrow of Folsom by militant inmates and the threatened use of hidden weapons. The ex-inmate identified certain inmates as leaders of a planned revolt. The plan described by the former prisoner involved seizure of all housing units within the prison at some early but undesignated date during the period when the men were returning for lockup.

During the morning hours of September 16, 1971, an inmate, while being apprehended for possible inebriation, became aggressive toward members of the prison staff, and a search of his person revealed a prison-made knife which was removed from him. Within a few hours, Mr. Turner, a civilian employee in the prison laundry, was fatally stabbed. Because of the general feeling of tension, the report of a planned prison uprising, the observation and seizure of two weapons within a matter of hours, and the killing of a prison employee, the prison was placed under an immediate and general lockup, for the dual purpose of searching and locating weapons and the identification and removal from the prison population of the inmates considered to possess the greatest potential for trouble. For this purpose both correctional officers and inmates were interviewed, the institutional records were reviewed and a determination was made that 37 inmates were either implicated in the rumors of the attempt to seize the prison or had serious records of violence or affiliations indicating a likelihood of potential threat to the safety of prison personnel. These 37 inmates were placed in the adjustment center, the purpose being, in the warden's view, "not to punish them, but to abort any prison takeover which might be in the making and to prevent any further violence." In addition, and for the same purpose, 34 other inmates were transferred to other facilities. The general search of the prison revealed 45 weapons and other contraband readily convertible into weapons.

After these steps were taken the warden found a substantial relaxation of tension within the prison. The 37 inmates transferred to the adjustment

center were subsequently interviewed, their case records analyzed and judgments made to retain them in the adjustment center, to release them to the general population of the prison, or to transfer them to other facilities.

Of the 37 inmates initially placed in the adjustment center three of petitioners remain, and by his supplemental affidavit Warden Craven avers that the reason for their continued confinement in the adjustment center is "because if they were released to the general population of the institution a real possibility exists that the security of the prison staff and other inmates would be threatened." The warden contends that tension, while reduced, remains present, that anonymous notes have been left at the desks of prison personnel, the tenor of which notes that further disruptions are currently planned; one informant whose statement has been verified by a lie detector has indicated there are plans for a disturbance at Folsom which would include attempted assassination of staff members. The warden, with reference to the men still confined in the Center concludes ". . . I am aware that their release into the general population would significantly increase tension among the other inmates. In view of the continued fear among the inmates of uprisings and violent demonstrations, I am at this time unwilling to increase that anxiety by putting four of the rumored troublemakers on the main line."

As indicated, three of the petitioners presently remain in the center. These are Rudolph Williams, who prior to transfer, was involved in a series of eight infractions of prison regulations since July 1971, and two additional infractions since confinement in the adjustment center. He is described as belligerent and hostile toward prison authorities and a "vocal inmate anxious to take part in further disruptions."

Benny Wardell Williams is described as having numerous involvements in violent behavior in the past. He is said to have been involved in numerous disciplinary violations since September 1971, including a burning incident in his cell.

The third is Archie Henderson, who was transferred to the California Correctional Institution at Tehachapi on February 3, 1972. However, on February 18, 1972, Henderson was returned to the adjustment center at Folsom after having been found in possession of a screwdriver sharpened into a stabbing implement.

Each of the other petitioners has been transferred to other institutions. All but one have been returned to the general population of the facility.

*Did the original confinement of petitioners constitute an abuse of discretion or violation of their rights to due process?*

No. The guidelines within which an appellate court properly reviews allegations such as those herein presented have been expressed both by the Supreme Courts of the United States and of California. It has been said that accusations of abuse of discretion "must be carefully scrutinized and the facts carefully weighed with the thought in mind that they are frequently filed by prisoners who are keen and ready, on the slightest pretext, or none at all, to harass and to annoy the prison officials and to weaken their power and control. These prisoners include many violent and unscrupulous men who are ever alert to set law and order at defiance within or without the prison walls. . . ." (*In re Riddle* (1962) 57 Cal.2d 848, 852 [22 Cal.Rptr. 472, 372 P.2d 304].)

In the instant case the warden and prison officials faced an inmate population surging with increasing tension and triggered by the San Quentin killings of August 1971. Reports from reliable informants sounded the warning of an attempted overthrow of the prison administration. This was followed by an incident in which a knife was discovered, and within a few hours the fatal stabbing of a civilian employee in the prison. A subsequent search of the inmates revealed 45 weapons of different kinds and types. In the light of the foregoing, we hold that the warden and prison administration not only had the right but the positive duty to take those steps best calculated to secure the institution.

Nor do we find that the summary confinement in the adjustment center without notice or hearing violated the petitioners' right of due process. In a similar context, when considering whether due process requires the presence of counsel at a parole hearing, the Supreme Court of California used the following language, which aids in a determination herein: ██ " ' "Due process" is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. . . . Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account.' (*Hannah* v. *Larche,* 363 U.S. 420, 442 [4 L.Ed.2d 1307, 1321, 80 S.Ct. 1502]; see *Sokol* v. *Public Utilities Commission,* 65 Cal.2d 247, 254 [53 Cal.Rptr. 673, 418 P.2d 265].) ██ Those elements of due process deemed essential for the protection of one accused of a crime are not inevitably guaranteed to one duly convicted of a crime. If the accused has been fairly tried, defended, convicted and sentenced, and has been afforded reasonable opportunity to appeal his conviction, the essential demands of due process have been fulfilled. Once the adjudicative process has ceased and the rehabilitative stage commenced, it becomes the respon-

sibility of the Adult Authority to determine, in its discretion, the appropriate terms and conditions for the release of the offender to society. At this stage, due process only requires that the Adult Authority discharge its responsibilities in good faith, neither arbitrarily nor capriciously, and that judicial review remains available to correct abuses of discretion. (See *In re McLain, supra,* 55 Cal.2d 78, 85-87 [9 Cal.Rptr. 824, 357 P.2d 1080].)" (*In re Tucker* (1971) 5 Cal.3d 171, 179 [95 Cal.Rptr. 761, 486 P.2d 657].)

By analogy, we apply the same standard of procedural due process to the imposition of augmented security measures upon individual inmates. Due process requires only that the warden discharge his responsibilities for prison safety and discipline in good faith, neither arbitrarily nor capriciously, and subject to judicial review for abuse of discretion.

■ Petitioners' confinement in and of itself under segregated conditions does not constitute "cruel and unusual punishment" within the meaning of the Eighth Amendment of the federal Constitution. As was said recently in a federal case involving a somewhat similar, although more aggravated, factual situation: "The basic responsibility for the control and management of penal institutions, including the discipline, treatment and care of those confined, lies with the Attorney General and is not subject to judicial review unless exercised in such a manner as to constitute clear arbitrariness or caprice upon the part of prison officials. Cannon v. Willingham, 10 Cir., 358 F.2d 719 and cases cited. Segregation, as such, is not a cruel nor unusual treatment, punishment or practice. Kostal v. Tinsley, 10 Cir., 337 F.2d 845.

"Appellant is not presently in segregation as a disciplinary control for specific misconduct but as an administrative control relating to inmates considered to be a 'threat to themselves, to others, or to the safety and security of the institution.' Bureau of Prisons Policy Statement, # 7400.4, issued 9-9-66. Such a policy is perfectly proper and lawful and its administration requires the highest degree of expertise in the discretionary function of balancing the security of the prison with fairness to the individuals confined. In the case at bar the record reveals that appellant's confinement in segregation is the result of the considered judgment of the prison authorities and is not arbitrary." (*Graham* v. *Willingham* (10th Cir. 1967) 384 F.2d 367, 368.)

■ We find the warden's conduct neither capricious nor arbitrary.

*Has the continued detention of petitioners in the adjustment center violated their constitutional rights?*

No. The California Supreme Court in *In re Jones* (1962) 57 Cal.2d

860, 862 [22 Cal.Rptr. 478, 372 P.2d 310], said: ". . . A person is not deprived of all of his constitutional rights by reason of his incarceration for a felony. The Fourteenth Amendment to the United States Constitution provides that no state shall 'deprive any *person* of life, liberty, or property, without due process of law; nor deny to any *person* within its jurisdiction the equal protection of the laws.' (Italics added.) A convicted felon, although civilly dead (see Pen. Code, §§ 2600-2604) is nevertheless a 'person' entitled to the protection of the Fourteenth Amendment. (*McCollum* v. *Mayfield,* 130 F.Supp. 112, 115-117; *Gordon* v. *Garrson,* 77 F.Supp. 477, 479.) There are many [judicial expressions] upholding the right of such persons to equal protection (*Dowd* v. *Cook,* 340 U.S. 206 [95 L.Ed. 215, 71 S.Ct. 262, 19 A.L.R.2d 784]; *Cochran* v. *Kansas,* 316 U.S. 255 [86 L.Ed. 1453, 62 S.Ct. 1068]) and to due process (*Ex parte Hull,* 312 U.S. 546 [85 L.Ed. 1034, 61 S.Ct. 640]; *United States* v. *Jones,* 207 F.2d 785; *Harper* v. *Wall,* 85 F.Supp. 783)." Although conduct or circumstances may have warranted the initial confinement, lapse of time or change in circumstances may subsequently dissipate or erode the legal justification for its continuance.

Very recently in *In re Hutchinson,* 23 Cal.App.3d 337 [100 Cal.Rptr. 124], we had occasion to review a case whose facts were somewhat comparable to those before us. We said at page 341: "Balancing the principles enunciated in *Riddle* and *Jones, supra,* we find it unnecessary to second-guess the reasonableness of the superintendent's action in transferring petitioner Hutchinson to K-Wing on August 22 and in keeping him there during the 'time of great tension' which followed the Jackson incident. It may be fairly inferred from the superintendent's own affidavit, however, that the period of tension did not extend beyond September 1971. . . . In the fact[s] of petitioner's allegations attacking his continued confinement in K-Wing, respondent has tendered no facts whatever to justify such incarceration after September; and at the oral argument herein on January 20, 1972 (when Hutchinson was still in K-Wing), respondent made no claim that the tension which Jackson's demise allegedly triggered at DVI still persisted." We further noted (at p. 341): ". . . Segregation under conditions of maximum security must be deemed excessive where it is of such duration that, as in Hutchinson's case, the prison authorities offer no facts which justify its continuance." We stressed in *Hutchinson* the absence of any facts warranting continued confinement. Such absence is of the utmost significance and constitutes an element clearly distinguishing *Hutchinson* from the case before us.

▉ The record herein reflects, on the contrary, a prison in which the initial tension is described as reduced but not yet subsided. The initial

tension was accompanied by some violence, culminating in a murder. A substantial number of weapons was found. Rumors persist. They are of such form and content that if true would constitute a grave threat to the security of the public, the prison, its staff and its inmates. While we are mindful that rumors and warnings frequently lack substance and are made from whole cloth, an appellate court cannot determine which are true, which are partially true, and which false. We think this is not our function.

Prison administration is a dangerous and infinitely complex business. Those who are engaged in it live in a world of high emotion, breathing air that is frequently charged with hostility and hate. The prison staff is surrounded by many men who are hardened, undisciplined, highly volatile and to whom violence is no stranger. It works in an atmosphere in which the price of a miscalculation or misjudgment may be human life and its forfeit instant. We have no doubt that to be effective a warden and prison staff require a highly developed sensitivity and awareness of the temperature and climate in an institution which is subject to the winds and tides of emotion, fear and threats of disruption. The injection of unknowledgable judicial second guessing would add to this an additional element of confusion.

The Folsom Prison administration, in its handling of the matters before us, has not been rigid and immovable. After the emergency confinement in the adjustment center the individual cases were reviewed and, of the 37 inmates originally confined, all but 11 had been released from the adjustment center at the time of the filing of the petition herein. Presently only three remain. One of those was transferred to another institution and then returned to the adjustment center because in the new facility he was found in possession of a sharpened screwdriver. The retention of the others appears to be neither capricious nor arbitrary. We will not substitute our views for the considered judgment of the professional staff of a prison. When called upon, we interpose our scrutiny but not our will where, as here, facts of substance are alleged in support of the administrative action.

Our function is to weigh carefully those cases of claimed violation of constitutional or legal rights and to determine whether or not there has been such violation. This we have done and find the petition lacks merit.

The petition for writ of habeas corpus is denied and the order to show cause issued herein is discharged.

Friedman, J., and Kongsgaard, J.,* concurred.

A petition for a rehearing was denied May 18, 1972, and petitioners' application for a hearing by the Supreme Court was denied June 15, 1972. Peters, J., Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairman of the Judicial Council.