[Crim. No. 9752. Fourth Dist., Div. Two. Apr. 18, 1978.]

In re ARLIN J. GATTS on Habeas Corpus.

## COUNSEL

Charles E. Ward, Public Defender, and William R. Dole, Deputy Public Defender, for Petitioner.

James M. Cramer, District Attorney, and Dennis S. Tilton, Deputy District Attorney, for Respondent.

## Opinion

**McDANIEL, J.**—Petitioner was convicted of drunk driving by the Colton Justice Court. He was subsequently placed on two years' probation. As a condition of probation, he was ordered to serve five weekends at the Glen Helen Rehabilitation Center (Glen Helen hereafter).

Glen Helen is governed by the "San Bernardino County Sheriff's Inmates Rules and Regulations Manual." The manual provides that inmates may not wear their hair longer than one and one-half inches from the scalp, and may not wear beards. Inmates who refuse to have an appropriate hair cut and shave are placed on disciplinary status in single cells. Those who shave but refuse to have their hair cut are placed in four-man cells.

On June 17, 1977, petitioner appeared at Glen Helen for his first weekend sporting a beard and long hair. He was informed of the hair regulation, but refused to comply. He was therefore placed in disciplinary confinement. He was told from time to time during the weekend that if he shaved off his beard, he would be placed in a four-man cell, but he still refused to comply. The same events occurred the second weekend petitioner appeared to serve time.

He then filed a writ of habeas corpus in the San Bernardino Superior Court, challenging the constitutionality of the regulation and of his disciplinary confinement. A hearing was held in the matter. At the conclusion of the hearing, the trial court found that the regulation was "reasonable, valid, justified, and . . . not arbitrary and . . . not unconstitutional." Accordingly, the superior court denied the petition. Petitioner applied to this court for a writ of habeas corpus, which was denied. Petitioner then sought a writ of habeas corpus in the Supreme Court, who returned the matter to this court for further proceedings.

### Issues, Discussion And Disposition

█ First, petitioner contends that his disciplinary confinement constitutes cruel and unusual punishment, in violation of the federal and state Constitutions. We observe initially that courts are reluctant to interfere with the discipline and control prison authorities exercise over their inmates. (*In re Riddle*, 57 Cal.2d 848, 852 [22 Cal.Rptr. 472, 372 P.2d 304].) █ When a prisoner charges that his confinement consti-

tutes cruel and unusual punishment, he must carry the burden of proof in this regard. (*Id.*)

■ The California Supreme Court has established that penalties which "[affront] contemporary standards of decency" (*People* v. *Anderson*, 6 Cal.3d 628, 648 [100 Cal.Rptr. 152, 493 P.2d 880], cert.den., 406 U.S. 958 [32 L.Ed.2d 344, 92 S.Ct. 2060]), or are so out of proportion to the offense that they shock the conscience and offend fundamental notions of human dignity (*In re Lynch*, 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921]) violate the proscription of cruel and unusual punishment.

■ In *In re Foss*, 10 Cal.3d 910 [112 Cal.Rptr. 649, 519 P.2d 1073], the Supreme Court set forth three techniques for determining whether a particular punishment is disproportionate to the offense. One of these techniques is to compare the penalty imposed with punishments prescribed in other jurisdictions for the same offense. Petitioner offers us documentation that neither Los Angeles nor Riverside Counties punish their inmates for having long hair and beards. However, a number of other jurisdictions do and such conduct has been upheld by courts in the face of constitutional attack. (See *Brown* v. *Wainwright*, 419 F.2d 1376, 1377; *Poe* v. *Werner*, 386 F.Supp. 1014 and cases cited therein; *Collins* v. *Schoonfield*, 344 F.Supp. 257, 272.) We fail to see how petitioner's disciplinary confinement can be considered cruel and unusual merely because two counties do not use it to punish the wearing of long hair and beards.

On the contrary, the California Supreme Court has approved the use of isolated confinement for disciplinary purposes. (*In re Harrell*, 2 Cal.3d 675, 691 [87 Cal.Rptr. 504, 470 P.2d 640], cert.den., 401 U.S. 914 [27 L.Ed.2d 814, 91 S.Ct. 890].) ■ It is also established that confinement under segregated conditions, in and of itself, does not constitute cruel and unusual punishment. (*In re Henderson*, 25 Cal.App.3d 68, 75 [101 Cal.Rptr. 479].) ■ These authorities, as well as petitioner's failure to carry the burden of proof that his confinement constituted cruel and unusual punishment, persuade us that it does not amount to such.

Next, petitioner contends that the hair regulation violates the equal protection clause of the Fourteenth Amendment and the freedom of expression clause of the First Amendment. ■ At the outset, we are mindful that "[l]awful incarceration brings with it the necessary with-

drawal or limitations of many privileges and rights." (*Brown* v. *Wainwright, supra,* 419 F.2d 1376, 1377.)

■ Petitioner argues that his disciplinary confinement violates equal protection because the county cannot show a compelling state interest justifying such confinement. ■ Regulations involving suspect classifications or touching on fundamental interests are subject to strict scrutiny. (*People* v. *Olivas,* 17 Cal.3d 236, 243 [131 Cal.Rptr. 55, 551 P.2d 375].) Under the strict scrutiny standard, the state bears the burden of establishing that a compelling interest justifies the regulation, and that the distinctions drawn are necessary to further its purpose. (*Id.*) All other regulations are presumed to be constitutional and must bear only a rational relationship to a conceivable legitimate state purpose. (*Id.*)

■ Petitioner argues that the strict scrutiny standard should be applied in this case because the hair regulation affects his fundamental right to "personal liberty." "Personal liberty" was designated a fundamental right in *People* v. *Olivas, supra,* 17 Cal.3d 236, 251.)

The issue in *Olivas* was whether a juvenile could be committed to the California Youth Authority for a period of time longer than the maximum sentence served by adults for the same offense. The "personal liberty" interest involved was the defendant's right to be free from incarceration and subsequent parole. Here, the interest involved is petitioner's "right" to wear his hair as he chooses. We fail to see how the two interests can be considered equal. Petitioner cites us to no authority for the proposition that one's choice in hair style and length is an aspect of the fundamental right of "personal liberty" and that hair regulations must be supported by a compelling state interest. ■ Therefore, hair regulations "need only be justified by some reasonable relationship between the legitimate concerns" of prison administration. (*Montalvo* v. *Madera Unified Sch. Dist. Bd. of Education,* 21 Cal.App.3d 323, 335 [98 Cal.Rptr. 593].)[1]

■ At the hearing on the writ, Captain Abernathy of the San Bernardino County Sheriff's office testified that the hair regulation was imposed for reasons of hygiene, prevention of escape, discipline,

---

[1]In *Montalvo,* the court concluded that choice of hair style was generally protected "by the 'liberty' umbrella of the Fourteenth Amendment." (*Id.,* at p. 334.) The rational relation test, and not the strict scrutiny test, was applied. In *Kelley* v. *Johnson,* 425 U.S. 238, 247 [47 L.Ed.2d 708, 715-716, 96 S.Ct. 1440], the court assumed that a Fourteenth Amendment liberty interest existed in matters of personal appearance and concluded that the rational relation test should apply.

rehabilitation, and safety. He further testified that the regulation made prisoner identification easy in the face of the high turnover rate at Glen Helen. He also stated that prisoners could use long hair and beards in which to conceal weapons and contraband.

Other courts have found that these factors constitute sufficient justification for hair regulations. (See, e.g., *Brown* v. *Wainwright, supra,* 419 F.2d 1376, 1377.) We agree and therefore find that the regulation is rationally related to the legitimate purposes of hygiene, safety, discipline, rehabilitation, prevention of escape, and easy identification.

Petitioner next argues that the regulation violates the equal protection clause for the additional reason that it is imposed on men and not on women. He further contends that the regulation establishes a suspect classification based on sex, which must be justified by a compelling state interest. For authority, he cites *Sail'er Inn, Inc.* v. *Kirby,* 5 Cal.3d 1 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]. In *Sail'er,* a section of the California Business and Professions Code which prohibited women, except licensees or wives of licensees, from tending bar. In invalidating the law, the court found that "sexual classifications are properly treated as suspect, particularly when those classifications are made with respect to a fundamental interest such as employment." (*Id.,* at p. 20.) Unlike the situation in *Sail'er,* however, the regulation here makes no reference whatsoever to sex. It merely states that inmates may not wear their hair longer than one and one-half inches and may not wear beards. We are not told which county correctional facilities use these regulations. On the basis of the facts we are given, it is apparent that this regulation, both on its face and in its application, is not directed towards one sex or another.

 Next, petitioner claims that the regulation abridges his freedom of expression as guaranteed by the First Amendment.[2] In support of his contention that wearing a beard and long hair is entitled to First

---

[2]In his petition, Mr. Gatts states that the cases which have upheld hair regulations predated the 1976 Supreme Court case of *Kelley* v. *Johnson, supra,* 425 U.S. 238. It is interesting to note that in *Kelley,* a police officer challenged departmental regulation of hair styles and length as being violative of the First and Fourteenth Amendments. The Supreme Court totally ignored the officer's First Amendment challenge to the regulation. Rather, it *assumed* that the regulation involved "some sort of 'liberty' interest" under the Fourteenth Amendment, and stated, "Thus the question is not . . . whether the State can 'establish' a 'genuine public need' for the specific regulation. It is whether respondent can demonstrate that there is no rational connection between the regulation . . . and the promotion of safety. . . ." (*Id.,* at p. 247 [47 L.Ed.2d at pp. 715-716].) Thus, *Kelley* dealt only with the Fourteenth Amendment aspect of the regulation and not with the challenge based on the First Amendment.

Amendment protection, he cites *Finot* v. *Pasadena City Bd. of Education,* 250 Cal.App.2d 189 [58 Cal.Rptr. 520].

In *Finot,* a high school teacher challenged a regulation requiring that he shave off his beard, on the basis that it violated the First Amendment. The court concluded that the teacher's decision to wear a beard was peripherally entitled to First Amendment protection. ■ The court utilized the following test to determine if the restriction was valid. " '[A] governmental agency . . . must demonstrate: (1) that the . . . restraints rationally relate to the enhancement of the public service, (2) that the benefits which the public gains by the restraints outweigh the resulting impairment of constitutional rights, and (3) that no alternatives less subversive of constitutional rights are available.' " (*Id.,* at p. 199.) The court noted that the principal of the high school and the superintendent feared that if male teachers were allowed to wear beards, it would be more difficult to get male students to comply with school regulations forbidding them from wearing beards. It further noted, however, as a matter of actual experience, that the wearing of beards by male teachers had not precipitated disobedience of the school rules. The court concluded that the fear of the administration provided a rational basis for the restriction in question (thus fulfilling part one of the test). However, the slight public benefit derived from easier enforcement of student rules did not outweigh the teacher's right to wear a beard. Nor was there an absence of alternative means to encourage students to comply with the rules. Thus, the regulation did not meet the three-pronged test, and it was accordingly declared invalid. In *Akin* v. *Board of Education of Riverside etc. Dist.,* 262 Cal.App.2d 161 [68 Cal.Rptr. 557], cert. den., 393 U.S. 1041 [21 L.Ed.2d 590, 89 S.Ct. 668], a school board's grooming policy was challenged on First Amendment grounds. This court applied *Finot's* three-pronged test and upheld the regulation. We, therefore, will apply the same test here.

■ As to the first prong we must determine if the restraint rationally relates to the enhancement of public service. As stated before, testimony at the hearing indicated that the hair regulation promotes good hygiene and safety, and that it serves as a means of preventing escape, of disciplining prisoners, and of rehabilitating them by compelling them to abide by a set of rules. Testimony also indicated that the regulation hinders inmates' efforts to conceal weapons and contraband.[3] Finally, the regulation promotes easy identification of prisoners, which is

---

[3]Captain Abernathy stated that in the past, contraband had been concealed in an inmate's hair.

especially important in light of Glen Helen's high turnover rate. As mentioned before, all of these factors have been tested by other courts and have been found sufficient to justify the imposition of hair restrictions. (See *Brooks* v. *Wainwright*, 428 F.2d 652; *Brown* v. *Wainwright, supra,* 419 F.2d 1376; *Poe* v. *Werner, supra,* 386 F.Supp. 1014; *Winsby* v. *Walsh*, 321 F.Supp. 523.)

We therefore conclude that the regulation rationally relates to the enhancement of the services provided by Glen Helen. Additionally, we conclude that the benefits derived from the regulation, in terms of discipline, easy identification, hygiene, etc. far outweigh petitioner's five-week-long loss of choice in hair styles. Finally, we can see no other "less subversive" way to accomplish the benefits produced by the regulation. This is especially true in terms of easy identification and hygiene. The regulation meets the three-pronged test and is valid.

■ Finally, petitioner argues that his disciplinary confinement and loss of good time constituted a grievous loss for which he was entitled to due process. He contends that he was entitled to (1) written notice, (2) assistance of counsel, (3) time to prepare a defense, (4) hearing before an impartial trier of fact, (5) right of confrontation and cross-examination, (6) opportunity to present evidence, (7) a recorded finding of fact, and (8) opportunity for review of the hearing by an administrative body or court.

As to petitioner's claim that he has been deprived of good time credit, the record is totally devoid of any substantiation of this point.

The facts indicate that petitioner was to serve five weekends and that he has served only two of the five. The only punishment imposed on petitioner, according to the record, is his disciplinary confinement. Additionally, petitioner is incorrect in contending that "due process is required wherever the prisoner might suffer 'grievous loss.' " By reference to *Meachum* v. *Fano,* 427 U.S. 215 [49 L.Ed.2d 451, 96 S.Ct. 2532], it will be seen that the Supreme Court's view is quite to the contrary.

As to whether or not petitioner was entitled to the due process rights he claims, our examination of California and federal case law forces us to conclude that he is not. The latest California decision on this issue was *In re Henderson, supra,* 25 Cal.App.3d 68, in which prisoners were placed in punitive solitary confinement because they were suspected of plotting to take over the prison. The prisoners claimed entitlement to notice and a hearing before being placed in segregation. The court responded:

"Those elements of due process deemed essential for the protection of one accused of a crime are not inevitably guaranteed to one duly convicted of a crime. If the accused has been fairly tried, defended, convicted and sentenced, and has been afforded reasonable opportunity to appeal his conviction, the essential demands of due process have been fulfilled. Once the adjudicative process has ceased and the rehabilitative stage commenced, it becomes the responsibility of the Adult Authority to determine, in its discretion, the appropriate terms and conditions for the release of the offender to society. At this stage, due process only requires that the Adult Authority discharge its responsibilities in good faith, neither arbitrarily nor capriciously, and that judicial review remains available to correct abuses of discretion. [Citations.] [¶] By analogy, we apply the same standard of procedural due process to the imposition of augmented security measures upon individual inmates. Due process requires only that the warden discharge his responsibilities for prison safety and discipline in good faith, neither arbitrarily, nor capriciously, and subject to judicial review for abuse of discretion." (*Id.*, at pp. 74-75.)[4] Thus, so long as confinement of the prisoner does not constitute an abuse of discretion, it will be upheld.

Petitioner here does not contest that his beard and long hair violate the regulation. In light of our previous conclusion that the regulation was justified, we cannot say that the authorities at Glen Helen abused their discretion by confining petitioner for disobeying the rule.

Federal case law is equally unavailing to petitioner's position. In *Wolff v. McDonnell,* 418 U.S. 539 [41 L.Ed.2d 935, 94 S.Ct. 2963], state law provided for good time credit for inmates, and further provided that those credits could be taken away only if the prisoner were found guilty of serious misconduct. In response to the claim that such credit could not be withdrawn in the absence of due process procedures, the court stated: "[H]ere the State itself has not only provided a statutory right to good time but also specifies that it is to be forfeited only for serious misbehavior. Nebraska may have the authority to create, or not, a right

---

[4]A 1973 Court of Appeal's case was decided after *Henderson,* but it involved the entry of a statement on the inmate's record that he had met with others in the prison library, contrary to the rules. (*In re Boag,* 35 Cal.App.3d 866 [111 Cal.Rptr. 226].) The prisoner argued that he was entitled to notice and a hearing before the entry could be made. While conceding that such an entry could have later dire consequences for the inmate, the court found that the entry "cannot . . . be equated with a parolee's loss of physical liberty . . . [i]t falls far short of those grave decisions which inflict a 'grievous loss' and evoke the Fourteenth Amendment's demand for prior notice and hearing." (*Id.,* at p. 870.)

to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing 'in every conceivable case of government impairment of private interest.' [Citation.] But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated ... [¶] We think a person's liberty is equally protected, even when the liberty itself is a statutory creation of the State. The touchstone of due process is protection of the individual against arbitrary action of government [citation]. Since prisoners in Nebraska can only lose good-time credits if they are guilty of serious misconduct, the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural due process appropriate for the circumstances must be observed." (*Id.*, at pp. 557-558 [41 L.Ed.2d at pp. 951-952].) The court concluded that the prisoner was entitled to written notice of the claimed violation, a written statement of the findings of fact made, the right to call witnesses and present documentary evidence where such would not create a danger, but not confrontation, cross-examination and the right to counsel.

Petitioner here argues that he was entitled to all the procedures afforded in *Wolff*, and then some.[5] However, we believe the holding in *Wolff* is inapplicable to the case at hand. This can be demonstrated by looking at the court's decision in *Meachum* v. *Fano, supra*, 427 U.S. 215, which was handed down after *Wolff*. In *Meachum*, a prisoner was transferred from a minimum security facility to a maximum security prison because he was suspected of starting a number of fires. On the basis of the *Wolff* decision, the district court and court of appeals concluded that the inmate was entitled to notice and hearing before his transfer. In reversing this decision, the Supreme Court held: "[W]e cannot agree that *any* change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause ... [G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules

---

[5]Petitioner argues that he had the right to the assistance of counsel and to confrontation and cross-examination.

of its prison system so long as the conditions of confinement do not otherwise violate the Constitution. . . [¶] . . . That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules." (*Meachum* v. *Fano, supra,* 427 U.S. 215, 224-225 [49 L.Ed.2d 451, 458-459].) Even though the prisoner was charged with serious misconduct, the court concluded that he was not entitled to notice and a hearing.

In commenting on its holding in *Wolff,* the court said: "[In *Wolff*], [t]he State itself, not the Constitution, had 'not only provided a statutory right to good time but also specifies that it is to be forfeited only for serious misbehavior.' . . . [¶] The liberty interest protected in *Wolff* had its roots in state law, and the minimum procedures appropriate under the circumstances were held required by the Due Process Clause 'to insure that the state-created right is not arbitrarily abrogated.' . . . [¶] Here, Massachusetts law conferred no right on the prisoner to remain in the prison to which he was initially assigned, defeasible only upon proof of specific acts of misconduct. . . . [T]ransfer in a wide variety of circumstances is vested in prison officials. The predicate for invoking the protection of the Fourteenth Amendment as construed and applied in *Wolff* v. *McDonnell* is totally nonexistent in this case." (*Meachum* v. *Fano, supra,* 427 U.S. 215, 226-227 [49 L.Ed.2d 451, 460-461].) As was the case in *Meachum,* California law confers no right on this petitioner to be left in the general inmate population. While disciplinary confinement may be more harsh than general confinement, use of the former does not necessitate procedural protections. On the basis of the decisions discussed above, we cannot conclude that state or federal case law mandates application of the procedures suggested by petitioner.

Further, it makes absolutely no sense to us that petitioner would want a factual hearing with all the accompanying rights. There are no disputed facts here. Petitioner concedes that his beard and hair violated the regulation. His sole argument deals with the constitutionality of his disciplinary confinement and the regulation. A factual hearing is simply not intended to deal with such issues. To be heard on the constitutional issues, petitioner had only to take advantage of habeas corpus proceedings in superior court, which he did. Thus, he had a forum for his legal arguments and could not have been assisted in this regard by a factual hearing at the administrative level. Therefore, we see no logical reason for extending to petitioner the due process rights to which he claims entitlement.

The petition is denied and the alternative writ discharged.

Morris, J., concurred.

**GARDNER, P. J.**—I concur.

I have nothing to add to Justice McDaniel's scholarly analysis in which he utterly demolishes the efforts of Mr. Gatts to elevate this picayune situation into an issue of constitutional proportions. However, as the Presiding Justice of this court and the one charged with its administration, I begrudge the time wasted in this case.

The judicial fabric of this court is already stretched to the breaking point. The five justices of this court, with the invaluable help of our dedicated but anonymous staff attorneys, are grinding out about 70 opinions per month. By primitive fingers and toes arithmetic, this comes to about 13 opinions per month per justice. Each opinion involves not only the time devoted to study, review, research, and the writing of an opinion, but to independent review of that opinion by two other members of the court. Needless to say, this involves a substantial amount of judicial time.

We must, by law, write an opinion in every case in which a direct appeal is taken from an appealable judgment or order. In addition, we process about 50 to 70 applications for extraordinary writs per month —habeas corpus, prohibition, mandamus and writs of review. Each of these applications involves a considered judgment as to whether or not to issue an alternative writ. If, after careful consideration, we determine that an alternative writ be issued, an opinion is then added to our already substantial caseload. We review these matters carefully. Insofar as habeas corpus is concerned, we issue alternative writs only if a fundamental right is involved. When this matter was originally presented, we determined, properly I submit, that the decision as to whether Mr. Gatts sits in a single cell or a four-man cell in defense of his beard while he served his five weekends in jail did not involve a fundamental constitutional right nor did it present any important question of law. It was and is a piddling case, its importance resting comfortably somewhere between insignificant and inconsequential.

To clear the air, I should point out that I am not anti-beard—far from it. If the sheriff had ordered that prisoners shave their beards and have crew cuts, I would have been among the first to man the barricades against this unreasonable intrusion into the lives of those citizens who are unfortunate enough to become his prisoners. However, the sheriff has not ordered that Mr. Gatts shave his beard. The sheriff does not care whether Mr. Gatts has a beard that grows to his navel or hair that grows to his buttocks. All the sheriff says is that those with beards present a problem in identification, in hygiene, in the prevention of escape, in supervision, and in discipline. For that reason he simply puts them into a different kind of security. Some jails have this rule, some do not. However, it is not for us to tell any sheriff how to run his jail. It is only when, in the operation of that jail, the sheriff violates the fundamental right of a prisoner that the courts become involved. This leads me to a discussion of county jails.

The operation of a county jail involves monumental problems of security, of supervision, of identification, of discipline, of maintenance, of regulation and of administration. A county jail is not a prison. It has a highly transient population as contrasted with the stable, long-term population of a prison. It has all the problems of a prison, a commercial hotel, and the emergency ward of a hospital.

I do not pretend to know anything about the operation of the San Bernardino County jail, but I do know something about the operation of the Orange County jail and I feel that all county jails in California probably face the same problems.

The average stay in a county jail is of limited duration. About one-third of all those booked into a county jail are released within a few hours. About one-half are released within a week and the average stay in a county jail is something in the neighborhood of 30 days. A county jail has a polyglot population which may contain vicious hardcore criminals and at the same time contain stable members of the community whose only departure from the paths of probity have been the failure to respond to overdue parking tickets. County jails usually contain an alarming number of persons who have merely been arrested on plain drunk charges. The stay of these individuals is usually measured in terms of hours rather than days. A county jail may contain convicted misdemeanants whose terms may not exceed six months and in most cases the terms are considerably less than 30 days. A county jail may contain felons who are serving time as a condition of probation, not to

exceed one year. A county jail contains presumed innocent persons who are awaiting trial and who may be charged with any offense imaginable. A county jail contains convicted murderers, robbers, rapists, and many other felons convicted of equally serious offenses who are waiting sentence after having been convicted. A county jail has men among its population. It has women among its population. It has work crews of trusties who, in Orange County at least, work in the county hospital, the animal shelter, and on the county parks and beaches. A county jail has those who are on work furlough and these persons are in and out of the jail every day. A county jail may range in population and size from enormous institutions holding hundreds or thousands of individuals in a large metropolitan area to one-cell jails found in the basement of the county courthouse in rural areas where the inmates are fed by the sheriff's wife.[1] A county jail has a large transportation problem as it delivers those waiting trial to the various courts scattered throughout the county. In a county the size of San Bernardino, this presents awesome problems in logistics and it goes without saying that a county jail numbers among its clientele a substantial percentage of individuals who would like to depart, many without awaiting due process of law.

And a county jail has inmates who are serving weekends. These are a real pain in the neck. Often as not they show up drunk and in an alarming number of cases they attempt to smuggle contraband into the jail via every orifice of the human body.

Now, if the sheriff, faced with all these problems of management, logistics, identification, hygiene, maintenance, regulation and administration, wants to put those with beards into one cell and those without beards into another, it is simply no business of the courts. The jailer may decide to divide up his charges by size, age, sex, appearance, color of eyes, prior record, or first initial of the last name ("All right, everyone from A to M gets a single cell, N to Z go into the holding tank"). Any or all of these classifications may seem arbitrary but they are necessary in the operation of a jail and none of them violate any fundamental constitutional right. The grand jury may issue critical reports of the jail, the board of supervisors may issue directives, various commissions and committees may view with alarm, an aroused citizenry may elect another sheriff, but the courts do not attempt to tell the sheriff how to run his jail.

---

[1] Several years ago the sheriff of a small Northern California county decided it would be cheaper to feed his charges frozen TV dinners. Prior to that time his wife, an excellent cook, had been feeding the prisoners. The sheriff told me that after he made the change, the crime rate dropped sharply in that county.

This case, in my opinion, is a classic example of the "Trivialization of the Constitution" so eloquently described by Justice Macklin Fleming in his excellent work, The Price of Perfect Justice. As Justice Fleming says at pages 129-130: "Trivialization sets in when the range of fundamental constitutional rights begins to be routinely used by the courts to justify judicial regulation of administrative decisions of the smallest moment—with the consequences that a sort of Gresham's Law operates under which bad judicial decisions drive good ones from public notice." Thus, I submit that the use of precious judicial resources in a determination whether Arlin J. Gatts should, in defense of his beard, sit in a single cell or a four-man cell when he does his five weekends in jail is inexcusable. The use of the Great Writ for this purpose debases that document. Additionally, the time devoted to this inconsequential case has denied some worthy litigant his day in court. Once an individual becomes involved in the judicial process, his life, to that extent at least, hangs in abeyance until that process reaches a conclusion. Thus, the judicial process must eventually come up with an answer to the litigant's problem. Hopefully that answer will be a correct one, but even an incorrect answer is better than no answer at all. People can live with an injustice which, after all, is usually in the eyes of the beholder. However, people cannot live with uncertainty. Once a decision is made, a person can live with that decision be it good or bad. But a person cannot live with no decision. Thus, it is essential that all cases be disposed of as promptly as possible. Thus, all of those enmeshed in the judicial process wait with such patience as they can muster as this court and others similarly situated slowly grind through the reviewing process until a final decision is reached. Any time unnecessarily devoted to paltry or trivial matters delays to that extent the determination of finality in all of the worthy cases which flood our judicial system.

I submit that the original decision of this court not to issue an alternative writ was a proper decision.