[Civ. No. 22448. Fourth Dist., Div. One. Apr. 10, 1980.]

EDWARD BRADSHAW, Plaintiff and Respondent, v.
JOHN DUFFY, as Sheriff, etc., Defendant and Appellant.

476

### COUNSEL

Donald L. Clark, County Counsel, Lloyd M. Harmon, Jr., Chief Deputy County Counsel, and John R. Garcia, Deputy County Counsel, for Defendant and Appellant.

Thompson, Crawford & Kellers and John A. Crawford, Jr., for Plaintiff and Respondent.

### OPINION

**COLOGNE, Acting P. J.**—Respondent John Duffy, Sheriff of San Diego County, appeals from a judgment which ordered a peremptory writ of mandate issue compelling Duffy and his representatives and employees to forthwith place Edward Bradshaw, respondent, in honor camp. The writ further ordered Duffy to "cease and desist from denying to persons committed to his custody, who have become or will become trustees, the right to be considered for placement in honor camp at the same time or times persons committed to the county jail who are not and will not become trustees are so considered."

The court originally sentenced Bradshaw on October 23, 1979. After a conviction of gambling offenses (Pen. Code, § 337a, subd. 1), he received probation, conditioned on 240 days custody in county jail. The court recommended Bradshaw be sent to honor camp or work furlough. When Bradshaw arrived at the jail on October 26, Deputy Sheriff Logan approached him and asked him to be a jail trusty. Logan told Bradshaw trusties receive certain privileges, such as better food and being able to sleep on sheets. Bradshaw agreed to become a trusty and began to perform trusty duties. Then he requested he be assigned to honor camp, as recommended by the committing court, but was not so assigned because of an alleged policy not to send jail trusties to honor camp until they have served the first half of their sentences. Bradshaw then on December 7, 1979, filed the instant petition for writ of mandate, seeking to be assigned to honor camp, which the trial court granted as stated above.

Because Duffy's appeal from the judgment for peremptory writ automatically stayed enforcement of the writ, Bradshaw was not sent to honor camp. On January 21, 1980, the trial court, therefore, modified Bradshaw's sentence by ordering him released forthwith, any further custody to be stayed for 60 days, a new hearing set for March 21, 1980. At the time of modification, Bradshaw had served 131 days of his 240-day sentence. The court stated it released Bradshaw because when the court originally set the confinement at 240 days, it believed much of that time would be served at an honor camp rather than in the county jail. Since that assumption has not been realized, a modification is appropriate. The court also noted Bradshaw's offense was a first offense and involved a victimless crime; he is not dangerous to the community; and he is particularly fit for honor camp or work furlough placement, in the court's opinion, because of his special truck driving skills.

Penal Code sections 4114, 4116, 4117 state the relevant law regulating honor camp placements. The sheriff must appoint the members of a county classification committee (committee). The committee meets at least once weekly to assign county jail inmates to suitable county operated adult detention facilities. Any prisoner whose jail sentence is greater than 30 days "shall appear" before the committee during the first third of his sentence. The court may recommend honor camp assignment, but has no power to commit a prisoner directly to any such placement. Only the committee may assign prisoners to outside facilities. (Pen. Code, § 4117 provides "[n]o person shall be transferred to an

industrial farm or camp unless he has appeared before the county classification committee and has been assigned to that facility.")

The evidence before the trial court included the declarations and pleadings of the parties and the testimony of Bradshaw and of Harriett Bossenbroek, the probation department representative member of the committee. Deputy Sheriff Logan, who is a member of the committee, declared trusties are "usually" assigned to honor camp for the second half of their sentences. The reasons for this situation are if trusties are permitted immediate placement in honor camp assignments, like other jail inmates, then "the length of stay of a trustee in the County Jail will be very uncertain. This will result in difficulty in preparing trustee assignment schedules. Furthermore, the jail will then be less equipped with trustees who are familiar with jail operations. Inasmuch as trustees play an important role in the operation of the jail, the loss of experienced trustees will disrupt the operations of the jail."

Bossenbroek testified to an understanding between the jail personnel and the committee, allocating 75 sentenced trusties to the jail. These trusties are ineligible to go to camp during the period of their "obligation." So far as the witness knew, Bradshaw "probably" would have been eligible for honor camp if he were not a trusty. Specifically, in response to a question whether Bradshaw would be ineligible for honor camp given certain facts about him, she testified: "Not that I know of. I would need to review the material. There are several articles that we review, but on the information you have given me, he probably would be eligible." Counsel then inquired whether if he were not a trusty Bradshaw would now be in honor camp, to which she responded "[p]robably."

When Bradshaw filed the petition for mandate on December 7, 1979, the first third of his sentence had not expired. Points and authorities filed on behalf of Duffy in the trial court alleged Bradshaw has actually "appeared" before the committee. Bradshaw's declaration below does not deny he has appeared. He asserts when Logan asked him to be a trusty, he did not tell Bradshaw such status would postpone honor camp eligibility. Had Bradshaw known being a trusty would postpone his assignment to honor camp, he would not have accepted the assignment.

There was no evidence describing or comparing (1) conditions in honor camps, (2) jail conditions for inmates who are not trusties, and (3)

conditions for jail trusties. The court stated it took judicial notice conditions in the county jail are worse than those in honor camp placements.

The court made factual findings, including the following: Bradshaw is eligible for honor camp and would have been sent there if he were not a trusty; it is the policy of the sheriff, Duffy, binding on the committee, to keep trusties from honor camp until they serve half their time; Bradshaw was not informed of that policy when he became a trusty; and the policy is "solely to maintain a work force of trustees within the jail and to avoid disruption of jail operations and was so adopted and is maintained without regard to the wishes or the duties of the persons designated to serve as trustees in the jail." The court concluded the practice is "arbitrary, capricious and discriminatory and violates the rights of Edward Bradshaw and other trustees so situated to equal protection of the laws. . . ." Accordingly, the court ordered a writ which (1) ordered Duffy to cease to implement the above practice and (2) ordered Duffy to cause Bradshaw to be placed in honor camp.

On appeal Duffy contends: (1) Because the committee, rather than Duffy, is charged with the duty of assigning jail inmates to honor camp, and the committee is not a party to this action, the court cannot mandate Duffy to place Bradshaw; (2) Bradshaw has not proved he is entitled to an honor camp placement, since (a) he had not served one-third of his sentence when he petitioned for a writ, (b) he is entitled only to appear before the committee, not to be sent to a particular facility, (c) he has been granted an appearance as the statute mandates, and (d) there is no evidence he is eligible for honor camp, only that he is "probably" eligible; (3) the practice challenged is constitutional because it has a rational relationship to legitimate jail administration considerations; (4) even if the practice were not legitimate, the court may not strike down that policy as to all affected persons in this individual mandate action, which is not a class action.

■ We conclude the court abused its discretion in ordering a writ of mandate, because the evidence does not establish Bradshaw's present right; and, further, Duffy is not shown in law or in fact to be the person charged with assigning inmates to honor camp. We further conclude the policy challenged is only partly invalid, insofar as it includes the practice of not informing potential trusties about the postponement of honor camp flowing from trustyship. Further, the trial court has the authority to invalidate that practice, either in a mandate action or as a form of declaratory relief. Accordingly, the judgment of the trial court must be

modified to deny the writ of mandate to Bradshaw, but to order Duffy and his employees and representatives to inform all jail inmates, when they are offered trusty positions, that if they accept such positions, they will not be eligible for honor camp until they have served the first one-half of their sentences and there may be other consequences they might expect to flow.

The statutes are unambiguous in assigning to the committee the duty of classifying inmates for honor camp facilities. Duffy has the responsibility to appoint committee members, but not otherwise to direct assignments. No evidence before the trial court tended to show Duffy in fact specifically controls individual placements. On the other hand, the evidence in Logan's declaration, coupled with Bradshaw's testimony, does tend to support the conclusion that with respect to the specific practice in issue of not sending trusties to honor camp during the first half of their sentences, Duffy has formulated that policy and the committee is applying it. We note the trial court's finding is in keeping with the narrowness of the evidence in that it does not find Duffy controls assignments, but rather, finds only that Duffy's trusty policy is binding on the committee.' Yet the relief goes beyond that evidence in ordering Duffy to put Bradshaw in honor camp.

What is more, there is no evidence establishing Bradshaw's present eligibility. There is only a statement of "probable" eligibility. There is no evidence detailing the physical factors, such as age, health and other matters, which may affect camp eligibility. Although it certainly appears reasonable and logical to assume a prisoner who is qualified to be a trusty is also qualified to be assigned to an honor camp, nevertheless a trial court can act only on the basis of the evidence before it, especially when issuing a peremptory writ against a public official. Abstract reasonableness of a factual assumption is insufficient proof of its validity. Although Bradshaw has asserted his eligibility, this assertion is not competent proof of the matter since he has not alleged familiarity with the criteria for eligibility on the basis of past experience or any other basis. In short, no evidence shows Bradshaw is presently eligible for an assignment or that Duffy has the duty to make such assignments. Under these circumstances a writ of mandate is not proper. (*Treber* v. *Superior Court* (1968) 68 Cal.2d 128, 134 [65 Cal.Rptr. 330, 436 P.2d 330]; *Loder* v. *Municipal Court* (1976) 17 Cal.3d 859, 863 [132 Cal.Rptr. 464, 553 P.2d 624]; *Reinbold* v. *City of Santa Monica* (1976) 63 Cal.App.3d 433, 438 [133 Cal.Rptr. 874]; *Baldwin-Lima-Hamilton Corp.* v. *Superior Court* (1962) 208 Cal.App.2d 803, 813 [25

Cal.Rptr. 798].) At best, Bradshaw might have been entitled to a writ ordering he be granted an appearance during the first third of his sentence, which is his statutory right. In fact, he has had such an appearance, which availed him nothing because of the challenged practice.

We turn to consideration of the policy involved. There is evidence, as we have stated, that this policy is of Duffy's making, and accordingly, a cease and desist order against him is technically proper. ■ Duffy's contention such declaratory relief may not be granted in a mandate proceeding has no merit. There are cases where petitions for writs of mandate became moot, yet the appellate courts decided such cases in order to establish the invalidity (or validity) of some practice or policy. (See, e.g., *Ballard* v. *Anderson* (1971) 4 Cal.3d 873 [95 Cal.Rptr. 1, 484 P.2d 1345, 42 A.L.R.3d 1392]; *In re William M.* (1970) 3 Cal.3d 16, 23 [89 Cal.Rptr. 33, 473 P.2d 737]; *Ramirez* v. *Brown* (1973) 9 Cal.3d 199, 203 [107 Cal.Rptr. 137, 507 P.2d 1345]; and see discussion in 5 Witkin, Cal. Procedure (2d ed. 1971) Extraordinary Writs, § 117.) These cases indicate the court's power in an action for mandate to grant what is essentially declaratory relief if the facts otherwise justify such relief. Further, even if this were not so, declaratory relief in the trial court would be appropriate in that Bradshaw, who has a substantial present concern in the administration of the honor camp/trusty policy, challenges what is in effect a regulatory rule promulgated by Duffy and applied by the committee. (See *Bess* v. *Park* (1955) 132 Cal.App.2d 49, 52 [281 P.2d 556]; *Chas. L. Harney, Inc.* v. *Contractors' Bd.* (1952) 39 Cal.2d 561 [247 P.2d 913]; *Associated Cal. Loggers, Inc.* v. *Kinder* (1978) 79 Cal.App.3d 34, 42-43 [144 Cal.Rptr. 786]; *Residents of Beverly Glen, Inc.* v. *City of Los Angeles* (1973) 34 Cal.App.3d 117, 125 [109 Cal.Rptr. 724]; *California Sch. Employees Assn.* v. *Los Angeles City Unified Sch. Dist.* (1976) 65 Cal.App.3d 848 [134 Cal.Rptr. 424]; *Pacific Legal Foundation* v. *Unemployment Ins. Appeals Bd.* (1977) 74 Cal.App.3d 150, 154 [141 Cal.Rptr. 474]; and note Code Civ. Proc., § 1060, and Gov. Code, § 11440, indicating the right of an "interested person" to challenge a government rule or regulation where there is an "actual controversy.") Although the pleading here is captioned a petition for writ of mandate and does not request declaratory relief, nevertheless the court may treat the action as one requesting such relief if the allegations establish the right to a declaration. (See, e.g., *Toomey* v. *Toomey* (1939) 13 Cal.2d 317, 320 [89 P.2d 634].) In short, we perceive no procedural impediment to the trial court's declaring the invalidity of current jail policy regarding trusties.

We think, however, the court went too far when it totally demolished Duffy's right to define and regulate jail trusties. We know of no requirement for the establishment of the category of jail trusty. A priori, there are no limitations on the manner in which Duffy can create and define this classification of prisoner. ■ Although there are judicial restraints on the discretion of prison officials to classify and control prisoners, these require only good faith classifications which are not arbitrary or capricious and which have some rational justification. (See *In re Gatts* (1978) 79 Cal.App.3d 1023, 1032-1033 [145 Cal.Rptr. 419].) Courts are properly reluctant to interfere with prison administration, given the manifold factual difficulties inherent in that task. (See *In re Gatts, supra*, and *Bell* v. *Wolfish* (1979) 441 U.S. 520 [60 L.Ed.2d 447, 99 S.Ct. 1861].) Here, Duffy states the following justifications for the classification: It is necessary for trusties to be familiar with their duties and with the internal operation of the jail, because little benefit can be obtained from their services until they learn the job. Only then, as counsel puts it, does the jail receive an "adequate rate of return" in exchange for conferring the benefits of trusty status. This justification sounds somewhat crass and offended the trial court below. However, when one remembers there is no entitlement to trusty status at all and no need for Duffy to have trusties, then it becomes a defensible proposition to urge that if Duffy creates trusties he may define that status in such ways as to benefit the jail administrators. Otherwise, he need not bother with the trusties at all.

Discussing the reasons why courts should not interfere unduly with prison officials' discretion, the court in *Bell* v. *Wolfish, supra*, 441 U.S. at pages 547-548, [60 L.Ed.2d at pages 474 to 475], stated: "Finally, as the Court of Appeals correctly acknowledged, the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. [Citations.] 'Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.' [Citation.] We further observe that on occasion, prison administrators may be 'experts' only by Act of Congress or of a state legislature. But judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a

particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial. [Citations.]"

See also the following in *Procunier* v. *Martinez* (1974) 416 U.S. 396, 404-405 [40 L.Ed.2d 224, 235-236, 94 S.Ct. 1800, 1807] (quoted in *Bell* v. *Wolfish, supra*, 441 U.S. at p. 548, fn. 30 [60 L.Ed.2d at p. 474]): "Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism."

Although prison officials are, of course, bound by statutory mandates of *length* of confinement (*Wolff* v. *McDonnell* (1974) 418 U.S. 539 [41 L.Ed.2d 935, 94 S.Ct. 2963] [good time credit]), they have generally broader discretion regarding *conditions* of confinement. (*In re Gatts, supra*, 79 Cal.App.3d 1023; *Bell* v. *Wolfish, supra*, 441 U.S. 520; *Meachum* v. *Fano* (1976) 427 U.S. 215 [49 L.Ed.2d 451, 96 S.Ct. 2532].) The United States Supreme Court stated in *Meachum* v. *Fano, supra*, that a prisoner may be transferred to a maximum security institution on the basis of serious misconduct with neither notice nor hearing, because there is no entitlement, statutory or otherwise, to placement in any particular institution. Similarly, here, no statute mandates honor camp placement, only consideration by a stated time. As pointed out in *In re Gatts, supra*, 79 Cal.App.3d at page 1035, at stake here is not the fundamental interest of liberty, which has already been forfeited after the adjudication of criminal guilt, but rather, the interest in rational and humane treatment. The court said in *Gatts*, at pages 1034 to 1035, quoting from *Meachum* v. *Fano, supra*, 427 U.S. 215: "'[W]e cannot agree that *any* change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke

the protections of the Due Process Clause...[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution...[¶]...That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules.' [Citation.] Even though the prisoner was charged with serious misconduct, the court concluded that he was not entitled to notice and a hearing.

"In commenting on its holding in *Wolff*, the court said: '[In *Wolff*], [t]he State itself, not the Constitution, had "not only provided a statutory right to good time but also specifies that it is to be forfeited only for serious misbehavior."...[¶] The liberty interest protected in *Wolff* had its roots in state law, and the minimum procedures appropriate under the circumstances were held required by the Due Process Clause "to insure that the state-created right is not arbitrarily abrogated."...[¶] Here, Massachusetts law conferred no right on the prisoner to remain in the prison to which he was initially assigned, defeasible only upon proof of specific acts of misconduct....[T]ransfer in a wide variety of circumstances is vested in prison officials. The predicate for invoking the protection of the Fourteenth Amendment as construed and applied in *Wolff* v. *McDonnell* is totally nonexistent in this case.' [Citation.] As was the case in *Meachum*, California law confers no right on this petitioner to be left in the general inmate population."

■ Thus, contrary to what Bradshaw asserts, the test of the legitimacy of the trusty policy is not compelling government interest, but rather, rational relationship to a legitimate prison goal. The goal of preserving orderly administration of the county jail is rational and permissible. The uncontradicted evidence before the trial court is to the effect the policy of retaining trusties during the first half of their sentences furthers that goal. The court did not find otherwise, nor do any of its findings indicate any pernicious or harmful results of such policy. As articulated by the trial court, the reason for the practice is to "maintain a work force of trustees" to "avoid disruption." Although the court appears to find such a policy *malum in se* because it is contrary to the wishes of the persons designated to serve as trusties, we do not think the mere fact a policy of the sheriff displeases the jail trusties is a reason to find it impermissible. There is no basis for the court's finding the policy is "arbitrary" or "capricious."

There is, however, some substance in the court's finding that the policy is discriminatory. The real unfairness appears to us to be found in the concealment of the practice from potential trusties until they have committed themselves. Such concealment denies them the same freedom to choose an honor camp placement as is afforded other inmates of the jail. There is no rational reason alleged for such concealment. No evidence was put before the court, nor was it even alleged, that no one would choose to be a trusty if he were informed of his options. Further, we think it presents a poor image of public officialdom, to the public as well as to the jail inmates, when the sheriff treats his charges in such a manner. There may well be occasions when secrecy is important to the efficient operation of the jail, but there is no evidence of that necessity here. In short, we think the present practice whereby the sheriff offers special privileges to inmates without their having a full understanding of the consequences should be discontinued. We also believe that where practical, any adverse consequences should be assented to in writing.[1]

The judgment of the trial court granting a writ of mandate is reversed. The court is directed to enter a new judgment which shall order Duffy, his employees and his representatives to inform each inmate of the county jail, to whom a trustyship is offered, the options available and the consequences of each.

Staniforth, J., and Wiener, J., concurred.

---

[1]Counsel for the appellant has informed us the trusty application is in writing and signed by the prisoner so that under the procedures followed by this county, it will pose no administrative problem to comply with this requirement. Their form of application will be amended to provide the applicant with the relevant rules.