[Crim. No. 21071. First Dist., Div. Two. Mar. 17, 1981.]

In re DERRYL D. CARR on Habeas Corpus.

## COUNSEL

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Gloria F. DeHart and Karl S. Mayer, Deputy Attorneys General, for Appellant.

Michael Satris, under appointment by the Court of Appeal, and Donald Specter for Petitioner.

## OPINION

**TAYLOR, P. J.**—The only issue presented by the People's appeal from an order granting petitioner, D. D. Carr, the habeas corpus and

declaratory relief requested[1] is whether the court below properly concluded that in reclassifying a prisoner's custody status, the administrative hearing must be conducted in accordance with all of the procedural due process standards set forth in *Wright* v. *Enomoto* (N.D.Cal. 1976) 462 F.Supp. 397, affirmed without opinion, *Enomoto* v. *Wright* (1978) 434 U.S. 1052 [55 L.Ed.2d 756, 98 S.Ct. 1223]. For the reasons set forth below, we have concluded that the order must be affirmed.

The pertinent facts were set forth as follows by the petition: Presently petitioner is confined at San Quentin, pursuant to a valid judgment and order of commitment which he has not challenged. He was received by the Department of Corrections (DOC) February 15, 1977, and, after reception center processing, was transferred to Soledad Prison (Soledad) under a "Maximum B" custody classification and assigned to the management control unit (MCU) of Soledad. On September 7, 1977, he was found guilty by a prison disciplinary committee of "involvement in an altercation" at Soledad. He was assessed a 20-month segregation term in a security housing unit (SHU) with a minimum eligible release

---

[1]With commendable objectivity, the petitioner concedes in his reply brief on appeal that as to him, the issue is moot since the relief requested was granted and he received the hearing he had sought and, therefore, the matter could be dismissed (*Environmental Coalition of Orange County, Inc.* v. *Local Agency Formation Com.* (1980) 110 Cal.App.3d 164, 170 [167 Cal.Rptr. 735]). However, the parties agree that the constitutional question presented is a recurring matter of broad public concern and of particular interest to other prisoners and the Department of Corrections (*In re Davis* (1979) 25 Cal.3d 384, 389 [158 Cal.Rptr. 384, 599 P.2d 690]). As noted in the somewhat similar circumstances of *In re Brindle* (1979) 91 Cal.App.3d 660 [154 Cal.Rptr. 563], at pages 669-670: "The function of habeas corpus has evolved from the traditional remedy for release of a prisoner to include a declaration of rights of a prisoner not entitled to outright release. [Citations.] The writ of habeas corpus may be used to secure fundamental rights of a person lawfully in custody. [Citations.] A person is not deprived of his constitutional rights by reason of his incarceration for a felony, although reasonable regulation of those rights is permitted. [Citations.]

"Once the court has issued a writ of habeas corpus it has the power to dispose of the matter 'as the justice of the case may require.' [Citations.] 'The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected.' [Citation.] Extraordinary relief by mandamus or habeas corpus has been utilized to correct prior conditions or to declare the rights of unnamed and future petitioners by decisions designed to affect the prospective administration of the criminal justice system. [Citations.] 'Where questions of general public concern are involved, particularly in the area of the supervision of the administration of criminal justice [the court] may reject mootness as a bar to the decision on the merits.' [Citation.] Although the petitioner may have received the relief prayed for, the court nevertheless may decide a question arising from a recurring problem important to insure the basic rights of prisoners. [Citation.] Habeas corpus is an appropriate procedure to be used by petitioners 'to obtain a declaration of rights in the prevailing circumstances.' [Citations.]"

date (MERD) of December 2, 1978; and also was reclassified as "Maximum A."

In April 1978, Carr was transferred from the Soledad SHU to Deuel Vocational Institute (DVI) in Tracy. The same month, he was transferred again to the SHU at San Quentin. On January 30, 1978, he received a disciplinary infraction for "manufacturing intoxicants"; as a result, his MERD was extended to December 7, 1978. As petitioner thereafter served his segregation term in the SHU without incident, in December 1978, he was considered by the institutional classification committee (ICC) at San Quentin for a transfer from the adjustment center to the MCU. However, he was denied such a transfer because of problems in the MCU. On January 4, 1979, he was transferred from the SHU at San Quentin to the MCU at DVI. After his arrival at DVI, he learned that he would not be eligible for contact visits for 90 days. At his request, he was retransferred to San Quentin on February 6, 1979, where he would be eligible for contact visits.

On February 23, 1979, the ICC again formally considered and recommended the transfer of the petitioner from San Quentin's adjustment center to San Quentin's MCU. The ICC[2] classified him as "Maximum B" and on February 28, 1979, the unit subclassification committee of the MCU accepted him for transfer to that unit and confirmed his "Maximum B" classification. The ICC action was duly noted and approved by the warden's office pursuant to established policy, although the chronological memoranda reflecting the classification decisions of February 19, 1979, indicate that neither Warden Sumner nor Deputy Warden Pulley attended the ICC's hearing on the petitioner on February 23, 1979.

On March 7, 1979, Warden Sumner issued a classification order which overturned and revoked the decision of the ICC to release petitioner from the adjustment center to the MCU at San Quentin. Sumner ordered petitioner to be returned immediately to "Maximum A," the most severe form of long-term confinement at San Quentin. "Maximum B" prisoners in the MCU retain significant rights and privileges, including contact and family visits, communal meals and more vocational, educational and recreational programs; "Maximum A" on the other

---

[2]The ICC took into account the petitioner's entire prison profile and noted that he was suspected of organizing black inmates at DVI. The ICC noted that since he had a reputation as an organizer, DVI's concern was understandable. The ICC, however, noted that: 1) he had served his SHU term without incident; and 2) his behavior at DVI was not sufficient to warrant his retention in SHU on an indeterminate basis.

hand is solitary confinement without any of the above privileges. Sumner noted that the ICC action had been taken while he was absent from the institution and that the ICC was not fully aware of certain facts and circumstances known to Sumner.[3] In light of the additional information furnished by Sumner, the San Quentin ICC reconvened on March 15, 1979, and determined that in light of Sumner's memorandum (which indicated that it was a mistake to put a person with as many enemies as the petitioner in a situation where he could be responsible for the death or injury of other inmates) the petitioner should be returned to the SHU at San Quentin and reclassified as "Maximum A."

On March 15, 1979, petitioner was placed in solitary confinement. He was subsequently seen by the SHU subclassification committee on April 9, 1979, as well as on July 12, 1979; each proceeding resulted in recommendations that petitioner remain in the SHU. The ICC indicated that the limitation to noncontact visits was based on his previous disciplinary history, which indicated that if contact visits were permitted, the safety of others, as well as the security of the institution, would be jeopardized.

The only issue on this appeal is whether or not the procedural due process protections set forth in *Wright* v. *Enomoto, supra,* 462 F.Supp. 397, apply to decisions to retain or place a prisoner in a "Maximum A" solitary confinement classification and return him to a SHU with the attendant restrictions for contact visits and other privileges, as detailed above at page 965.

*Wright, supra,* was a class action brought by male prisoners confined to or subject to confinement in maximum security at four prisons in this state, located at San Quentin, Folsom, Soledad and Tracy. The three-judge district court, so far as here pertinent, held that inmates subject to maximum security confinement for administrative reasons at a minimum were entitled to the following procedural safeguards (at pp. 404-405): "(1) written notice of the reasons in sufficient detail to enable the prisoner to prepare a response or defense, said notice to be furnished, except in case of genuine emergency, before initial placement in the maximum security unit, but, in any event, not more than forty-eight (48) hours after such initial placement;

---

[3]Namely, that petitioner had been responsible for the 1979 stabbings of Mexican Mafia inmates at the Soledad MCU, and that as a result, the Soledad SHU was shut down for nine months. Petitioner also had been responsible for the Mexican Mafia stabbings at San Quentin in 1973.

"(2) a fair hearing before one or more prison officials, said hearing to be held not less than seventy-two (72) hours after placement in the maximum security unit unless the inmate requests, in writing, additional time in which to prepare a defense;

"(3) representation by counsel-substitute when prison officials determine that the inmate is illiterate or that the complexity of the issues makes it unlikely that he can collect and present the evidence necessary for an adequate comprehension of the case; determination and designation of counsel-substitute to be made at the time of the giving of the aforesaid notice; if counsel-substitute is not provided, the reasons must be stated in writing at the time of the hearing;

"(4) an opportunity to present witnesses and documentary evidence unless prison officials determine in good faith that permitting such evidence will be unduly hazardous to institutional safety or correctional goals;

"(5) a written decision including references to the evidence relied upon and the reasons for such confinement."

The People argue that *Wright, supra,* applies only to transfers of prisoners from the general population to secured housing units; and that in any event, *Wright* has been superseded by *Greenholtz* v. *Nebraska Penal Inmates* (1978) 442 U.S. 1 [60 L.Ed.2d 668, 99 S.Ct. 2100], and *People* v. *Ramirez* (1979) 25 Cal.3d 260 [158 Cal.Rptr. 316, 599 P.2d 622]. We think the People's attempt to limit *Wright, supra,* amounts to a distinction without a difference. Our interpretation is buttressed by *Hughes* v. *Rowe* (1980) 449 U.S. 5 [66 L.Ed.2d 163, 101 S.Ct. 173] in which the United States Supreme Court indicated, at footnote 6 on page 970 [66 L.Ed.2d page 169], that the due process clause of the Fourteenth Amendment affords a state prisoner the following minimum procedural safeguards before disciplinary action may be taken against him: 1) advance written notice of the charges; 2) an opportunity to call witnesses and present documentary evidence provided that to do so will not jeopardize institutional safety or correctional goals, before a sufficiently impartial hearing board; and 3) a written statement by the factfinder setting forth the evidence relied upon and the reasons. *Hughes, supra,* like *Wright, supra,* relied on *Wolff* v. *McDonnell* (1974) 418 U.S. 539 [41 L.Ed.2d 935, 94 S.Ct. 2963]. *Greenholtz, supra,* merely established that the nature of any hearing required to be

had must be determined by balancing the prisoner's liberty interest and the state's correctional needs and objectives.

In *Ramirez, supra*, 25 Cal.3d 260, our Supreme Court criticized the federal emphasis on the necessity for a statutory limitation to protect the liberty interest on the ground that it "undervalues the important due process interest in recognizing the dignity and worth of the individual by treating him as an equal, fully participating and responsible member of society" (p. 267).

In *Ramirez*, our Supreme Court, in determining the applicability of the due process clauses of the California Constitution (Cal. Const., art. I, § 7, subd. (a); Cal. Const., art. I, § 15) to a patient-inmate at the California Rehabilitation Center in connection with exclusion proceedings, held that "the due process safeguards required for protection of an individual's statutory interests must be analyzed in the context of the principle that freedom from arbitrary adjudicative procedures is a substantive element of one's liberty" (*Ramirez, supra*, p. 268). The California Supreme Court has clearly articulated the principle that the procedural protections required to comply with due process depend upon a careful balancing of the governmental and private interests at stake.

Elaborating on this principle, the court stated: "In some instances this balancing may counsel formal hearing procedures that include the rights of confrontation and cross-examination, as well as a limited right to an attorney. [Citations.] In others, due process may require only that the administrative agency comply with the statutory limitations on its authority. [Citation.] More specifically, identification of the dictates of due process generally requires consideration of (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official, and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail" (*Ramirez, supra*, p. 269).[4]

---

[4]In *Ramirez*, the court held that due process was satisfied as: 1) the inmate had an opportunity to respond prior to the final decision; 2) the inmate received a statement of grounds and access to the information on which the decision was based; 3) notice of the

The due process right to a hearing of inmates placed in segregation again was reiterated by our Supreme Court in *In re Davis, supra,* 25 Cal.3d, page 396.

Here, the petitioner's traverse conceded that he appeared and was afforded an opportunity to speak and to present his views at the 1979 classification proceedings here in issue. The petition also confirms his ability fully to inform the DOC of his views about the classification decisions made, and that he received a copy of the information relied upon by the ICC, namely, Sumner's memorandum of March 7, 1979. The record also reveals that petitioner received advanced written notice of the hearing and a copy of the written decision, as required by the pertinent provisions of the DOC Classifications Manual, set forth below.[5]

---

right to respond; 4) the right to respond orally if the inmate chose to do so; and 5) a written statement of the final decision and reasons. The court based its conclusion on several factors unique to California Rehabilitation Center proceedings described as follows, "the Director's decision is evaluative in nature and based on his specialized subjective judgment; that judgment depends on consideration of a host of intangible factors rather than ...contestable facts. As a result, *more formal procedures than those previously identified would not reduce* the likelihood of an erroneous determination, unless the individual challenging the decision could confront and cross-examine all the experts and persons who contributed information to his case history and to his psychiatric reports and criminal record. Even then, the marginal value to the individual would seem to be relatively insignificant because of the difficulties inherent in challenging the subjective aspects of an evaluative-type decision. Moreover, such extensive procedures would substantially impair administrative efficiency. Consequently we do not believe they are needed to protect the interests of the excluded CRC patient-inmate" (pp. 275-276; italics added).

[5]So far as here pertinent, the manual provides for:

(1) Advance written notice to the inmate of the hearing, of the proposed action (§§ 305(c), 306(a));

(2) A hearing with personal appearance by the inmate to permit full participation by the inmate and presentation of the inmate's position or point of view, including the use of any documented information (§§ 305(a), 305(b));

(3) Where the inmate is unable to prepare a defense, or where the matter is complex, the inmate is assisted by his case worker or by an investigating officer (§ 305(c));

(4) A written decision including the reasons continued security unit housing is deemed necessary (§§ 305(h), 3612(f)(2)). A copy of the decision must be given to the inmate (§§ 305(h), 3612(h));

(5) At least every 90 days, SHU inmates are reviewed by their unit classification subcommittees (§ 3615(a)). The inmate appears before the subclassification committee and written decisions setting forth reasons for continuing the inmate in SHU are required (§§ 3614(e), 3614(f)(3));

(6) At least once each year, and sooner whenever recommended by the unit subcommittee (§ 3615(b)), the ICC must consider release of the inmate from the SHU (§ 3615(c)(2)). Such a review includes a hearing and discussions with the inmate of the decision and of the reasons for it (§ 3615(c)(2)). A review decision of the ICC is made in writing and includes the reasons for the decision (§ 3615(d)).

Thus, this case focuses on the two elements added to the existing procedure: 1) pursuant to *Wright, supra,* and *Hughes* v. *Rowe, supra,* the opportunity to present witnesses and documentary evidence, unless unduly hazardous to institutional safety or correctional goals; 2) pursuant to *Wright* v. *Enomoto, supra,* representation by a counsel substitute where deemed necessary.

Applying the four-pronged test of *Ramirez,* quoted above, we note that even a brief description of the conditions in the SHU at San Quentin[6] illuminates the basic personal liberty interests affected, as well as the risk of an erroneous deprivation of the residuum of liberty retained by prisoners. Even the DOC Classifications Manual also recognized that a change in the custody level has a substantially adverse effect on conditions of confinement (§ 307; Cal. Admin. Code, tit. 15, § 3375). At the time of the instant actions pertaining to the petitioner, former title 15, California Administrative Code section 3372,[7] subdivision (c), provided: "Classification committees will not place or retain an inmate in a security housing unit *unless such placement* is deemed to be *the most appropriate* of all placement resources available within the facilities of this department. *All other reasonable alternatives will be explored* before security housing unit placement or retention is used. All cases of inmates in security housing units will be subject to frequent director's staff review." (Italics added.)

Some federal courts have indicated that segregated confinement amounts to cruel and unusual punishment or a violation of substantive due process if the punishment is imposed arbitrarily and without basis (*Wilwording* v. *Swenson* (8th Cir. 1974) 502 F.2d 844, 851, cert. den. 420 U.S. 912 [30 L.Ed.2d 418, 92 S.Ct. 407]; *Black* v. *Warden, U. S. Penitentiary* (10th Cir. 1972) 467 F.2d 202, 203-204; *United States* ex rel. *Bennett* v. *Prasse* (E.D.Pa. 1976) 408 F.Supp. 988, 999). Our Su-

---

[6]In *Wright* v. *Enomoto, supra,* 462 F.Supp at page 399, the court noted that: "Prisoners in the maximum security units are confined in cells approximately five feet wide by eight feet long. The cells are without fresh air or daylight, both ventilation and lighting being poor. The lights in some cells are controlled by guards. It is difficult for prisoners to get needed medical attention. They must eat in their cells or not at all. They are allowed very limited exercise and virtually no contact with other prisoners. They cannot participate in vocational programs. They are denied those entertainment privileges provided for the general prison population. Parole is usually denied to them until after release from maximum security segregation." This description recently was quoted and elaborated upon by our Supreme Court in *In re Davis, supra,* 25 Cal.3d 384, 387-388.

[7]Subsequently superseded by regulations adopted in California Administrative Register 80, No. 16, April 1980.

preme Court in *Ramirez, supra,* 25 Cal.3d at page 268, stated that "freedom from arbitrary adjudicative procedures is a substantive element of one's liberty." In light of the above authorities and the mandate of our Supreme Court in *Ramirez, supra,* we reject the People's contention that we should follow the reasoning of the Sixth Circuit in *Bills* v. *Henderson* (1980) 631 F.2d 1287, 1294-1296.[8]

In light of the above, given the balancing required by *Ramirez,* the People have failed to convince us that the governmental interest, including the administrative burdens, would be greater by the addition of the additional safeguards here in issue. We do not agree with the People's argument that the petitioner's reclassification to "Maximum A" is comparable to an inmate's exclusion from the California Rehabilitation Center involved in *Ramirez, supra,* at footnote 4 on pages 968-969, this opinion. Admittedly, some subjective judgments are involved in both situations. However, here, there are not only subjective elements and petitioner's witnesses might be able to challenge the facts on which the Warden based his conclusions.

We hold that the trial court properly concluded that all of the elements specified in *Wright* v. *Enomoto, supra,* were required to afford the petitioner a due process hearing under the substantially similar federal and state due process clauses. Even assuming that, as in other instances, the protection afforded under the federal Constitution is not as broad in scope as that of the independent state provision, the trial court's conclusion is proper pursuant to the state constitutional provision.

The order appealed from is affirmed.

Rouse, J., and Smith, J., concurred.

A petition for a rehearing was denied April 16, 1981, and the opinion was modified to read as printed above.

---

[8]In *Bills,* the court found, at page 1294, that the particular administrative guidelines in issue sufficiently limited the discretion of the prison officials in making decisions regarding administrative segregation. The court also found, however, that the guidelines created a legitimate expectation on the part of inmates that they would not be transferred to administrative segregation without a finding that the transfer was for the purpose of protecting the inmate or other inmates or for the purpose of promoting and maintaining order in the institution.