[Civ. No. 61642. Second Dist., Div. Four. Mar. 24, 1982.]

INMATES OF SYBIL BRAND INSTITUTE FOR WOMEN et al., Plaintiffs and Appellants, v.
COUNTY OF LOS ANGELES et al., Defendants and Appellants.

92

**COUNSEL**

Terry Smerling, Fred Okrand, Mark D. Rosenbaum, Alschuler & Grossman, Karen Kaplowitz and Paul Samuels for Plaintiffs and Appellants.

John H. Larson, County Counsel, and Frederick R. Bennett, Deputy County Counsel, for Defendants and Appellants.

OPINION

McCLOSKY, J.—Plaintiffs in a class action brought on behalf of "all women who are or in the future will be incarcerated at Sybil Brand Institute for Women" against the County of Los Angeles and others, appeal from judgment entered therein, contending:[1]

1. The due process clause of the California Constitution mandates strict scrutiny of substantial restraints on pretrial detainees' liberty beyond those which inhere in detention.

2. The challenged substantive restraints on pretrial detainees are imposed on the basis of wealth and therefore must be subjected to strict scrutiny under the equal protection clause of the California Constitution, article I, section 7.

3. Conditions and privileges (at Sybil Brand Institute) inferior to those experienced by male prisoners in the county jail system are forms of sex discrimination which must be subjected to careful scrutiny.

4. The due process clause of the 14th Amendment requires that jail regulations which intrude upon fundamental interests must be tailored to serve legitimate interests of jail administration.

5. The procedure for processing prisoners to and from court abridges the right of fair trial and invidiously discriminates against pretrial detainees.

6. Defendants' practice of routinely and without exception denying female inmates contact visitation cannot pass constitutional muster.

7. Plaintiffs' meager opportunity to go out-of-doors is unconstitutional.

8. Access to telephones enjoyed by prisoners at Sybil Brand Institute is inferior to that enjoyed by male prisoners in other facilities and consequently discriminatory.

9. Defendants' disciplinary procedures do not comport with due process of law.

---

[1]In addition, each party challenges the award of attorneys' fees. These contentions are set forth and addressed in the last portion of this opinion.

10. Defendants' procedures for placing prisoners into the administrative segregation area known as "control" do not satisfy due process of law.

Respondents County of Los Angeles et al., cross-appeal from an order of the trial court awarding attorneys' fees to appellants in the amount of $105,760, contending:

1. An award of attorneys' fees should not include compensation for efforts expended on the application for attorneys fees, unless there exist special circumstances that would make a denial of such additional fees unjust.

2. Not only are there no special circumstances in the present action that warrant reimbursement for efforts expended on the application for attorneys fees, but the particular circumstances of this action make the inclusion of compensation for such efforts particularly inappropriate.

### I. Facts

Sybil Brand Institute for Women (hereinafter SBI), is a four-story concrete building in which the County of Los Angeles maintains a jail facility for women inmates including pretrial, sentenced and other types of prisoners. Its rated capacity is 950 inmates, but the average daily population at the time of the judgment ranged from 700 to 850 persons, of whom 275 to 300 are sentenced and the balance are pretrial detainees. The average period of incarceration is 14 days for pretrial detainees[2] and 80 days for sentenced inmates. The inmate turnover is 70 to 100 inmates per day. The facility contains dormitories which house 90 percent of the inmates and cell blocks which house the remaining 10 percent. The dormitories are large, clean and bright, lighted not only with artificial lighting but also with sunlight from large windows along the length of both sides. Each housing area has its own dayroom equipped with benches, tables, stools, a television set, a tub, a sink, a washer and dryer, a bidet, and shower and toilet facilities.

Appellant inmates brought this class action against the Sheriff of Los Angeles County, some of his subordinates who are concerned with the

---

[2]This figure must be considered in light of the fact that 50 percent of the prisoners booked into the county jail system are released within 48 hours and 80 percent are released within 10 days.

administration of SBI; and the members of the county board of supervisors, challenging the legality of numerous conditions of confinement and practices at SBI. The plaintiff class contains two subclasses: pretrial detainees and sentenced prisoners.

Trial of the case involved approximately 14 days of testimony, the receipt of many exhibits, an inspection visit by the trial judge to the SBI and the submission of pretrial and posttrial briefs.

The trial court held that certain of respondents' practices were not sufficiently justified by legitimate governmental interests and enjoined those practices.[3] It also found that although certain practices, which were in effect at the time of trial, were not sufficiently justified by legitimate governmental interests, intervening modifications by the sheriff justified those modified practices current at the time of the judgment.[4] The trial court held that the remaining challenged practices either met constitutional requirements (e.g. disciplinary practices, see par. 21 of the judgment) or were reasonable and sufficiently justified by legitimate government interests. Those practices included: (1) the denial of "contact" visits; (2) rules relating to dining room behavior; (3) medical and dental care; (4) disciplinary procedures; (5) the limited involvement of male deputies with the disrobing of violent and unstable inmates whose clothes must be removed for their own protection; (6) court transportation procedures; (7) use of "control" facilities; (8) booking procedures; (9) alleged overcrowding; (10) differences in treatment between male and female inmates within the Los Angeles County jail system; (11) educational and vocational programs; (12) training and experience of officers and deputy personnel; and (13) attorney room facilities.

---

[3]Those practices enjoined included: (1) the prohibition of receipt of newspapers and periodicals through the mails, other than from publishers or approved vendors or distributors; (2) permitting pretrial inmates to eat with spoons only and denying them to use of knives and forks; (3) the former practice of excluding women inmates from the work furlough program.

[4]Such modifications include the following:

(1) At the time of trial all sentenced prisoners were classified as minimum security and all pretrial detainees as maximum security. At the time of judgment, all inmates, pretrial and sentenced, were classified into two broad categories: (a) maximum and medium security and (b) minimum security.

(2) At the time of trial inmates were required to submit written requests for telephone calls and priorities were established for the making of telephone calls. At the time of judgment access to telephones was on a rotation basis by means of a signup list, except for the priority given to emergency requests.

(3) At the time of trial most sentenced inmates had direct access to a browsing li-

In this appeal appellants contend that the trial court erred in its ruling relating to the denial of "contact" visits, disciplinary procedures, court transportation procedures, the use of "control" facilities, outdoor recreation procedures, and access to telephones. The facts relevant to each of these issues will be set forth below in the discussion of the issues.

## II. THE STANDARD OF REVIEW

The scope of review in cases challenging the constitutionality of procedures and conditions at custodial institutions varies depending upon the nature of the right asserted.

■ A condition of confinement which impinges upon a fundamental interest must be justified under both state and federal Constitutions by compelling governmental interest which cannot be satisfied by less intrusive means and is subjected to strict scrutiny on review. (*People* v. *Olivas* (1976) 17 Cal.3d 236, 243 [131 Cal.Rptr. 55, 551 P.2d 375].) Under the California Constitution the same is true of regulations which accord different privileges on the basis of gender, a "suspect" classification. (*Molar* v. *Gates* (1979) 98 Cal.App.3d 1, 13 [159 Cal.Rptr. 239, 12 A.L.R.4th 605].)

However, where the challenged condition touches on neither equal protection of the law nor a fundamental interest, it will survive judicial review if substantial evidence supports the conclusion that the regulation is reasonably related to a legitimate governmental purpose. This is true whether the challenge is asserted by sentenced prisoners (*In re Gatts* (1978) 79 Cal.App.3d 1023, 1029 [145 Cal.Rptr. 419]) or pretrial detainees (*Bell* v. *Wolfish* (1979) 441 U.S. 520 [60 L.Ed.2d 447, 99 S.Ct. 1861]).

---

brary once a week, but pretrial inmates had access only to a cart of library books brought to their housing area once a week. At the time of judgment most inmates had direct access to a browsing library twice a week during recreational periods, and maximum security inmates (about 10 percent of the population) had access to library books by means of the book cart.

(4) At the time of trial only sentenced inmates and pretrial inmates in in propria persona status were permitted access to the SBI law library. At the time of judgment it was available to all inmates.

(5) At the time of trial pretrial prisoners and some sentenced prisoners were allowed one hour of outdoor exercise four times a week in an asphalt covered recreation area while most sentenced prisoners were permitted to use a larger, partially grass covered area for one hour twice a week. At the time of judgment most inmates (90 percent of the population) were allowed to use the large area twice weekly and maximum security inmates (10 percent of the population) used the smaller area on the same frequency.

■ Appellants argue vigorously that *Bell* v. *Wolfish, supra,* does not, under the California Constitution, control conditions of confinement for pretrial detainees because personal liberty is a fundamental interest, and substantial restraint thereon must be subjected to strict scrutiny under the due process clause of the state Constitution. They also argue that restraints upon the liberty of pretrial detainees are the result of a wealth-based classification which is regarded, under the California Constitution, as a suspect classification which must be justified by a compelling governmental interest and subjected to strict judicial scrutiny.

They acknowledge that another division of this court held in *In re Smith* (1980) 112 Cal.App.3d 956 [169 Cal.Rptr. 564] that *Bell* v. *Wolfish, supra,* 441 U.S. 520, controlled in cases where pretrial detainees challenged conditions of their confinement, but argue that the *Smith* court's analysis was improper and urge this court to "overrule" that decision. *In re Smith, supra,* stands unobliterated. We have no power of review over a decision of another division of this district and we, of course, may not "overrule" it. (See *In re Ruth H.* (1972) 26 Cal.App.3d 77, 86 [102 Cal.Rptr. 534].) *In re Smith* specifically held, at page 967, that: "[W]hile we are cognizant that the "'bail system . . . frequently works an injustice on those who cannot afford to post a bail bond . . .'" [citation], we do not find that the inability to make bail per se constitutes a denial of equal protection."

Certain parole violators and certain other pretrial detainees are not entitled to release on bail, and some persons charged with violations of law are released on their own recognizance. The amount of bail set for serious crimes is often set in amounts which even the wealthy might have difficulty meeting. Yet we consider it undeniable that factors of wealth do enter into considerations of whether to release a pretrial detainee on bail or on his or her own recognizance. Those factors, include among others, the detainee's employment or other sources of income and his property holdings. (See *Van Atta* v. *Scott* (1980) 27 Cal.3d 424, 444 [166 Cal.Rptr. 149, 613 P.2d 210]; see also *In re Podesto* (1976) 15 Cal.3d 921, 934-935 (fn. omitted) [127 Cal.Rptr. 97, 544 P.2d 1297].)

While we are not necessarily in agreement with our sister division, we feel constrained by the principle of stare decisis to avoid conflict with it, and we therefore conclude that pretrial detainees are not, as a matter of law, members of a wealth-based classification. (See also *In re Smith,*

*supra*, 112 Cal.App.3d at pp. 966, 967 and *People* v. *Gilliam* (1974) 41 Cal.App.3d 181 [116 Cal.Rptr. 317].)

If the accused cannot or chooses not to post bail, he or she becomes a member of the population of a detention facility. Although the pretrial detainee is presumed innocent and may not be subjected to punishment, common sense dictates that protection of his or her liberty interest, though no less fundamental, must be compromised with the regulations necessary to the functioning and security of the facility in which he or she is confined. (See *Bell* v. *Wolfish, supra*, 441 U.S. 520.) While they must not unquestioningly defer to prison officials' analyses of security issues (see *Wright* v. *Rushen* (9th Cir. 1981) 642 F.2d 1129, 1134), the courts reviewing conditions of confinement have recognized that control of jails and prisons is best left to the experts who are charged with the responsibility of running them, except when the conditions do not comport with concepts of human dignity or constitutional principles. (See *Bell* v. *Wolfish, supra*, 441 U.S. 520, and *Dillard* v. *Pitchess* (C.D.Cal. 1975) 399 F.Supp. 1225, 1234-1235.) ▮ With regard to pretrial detainees, the proper inquiry is whether the condition amounts to prohibited pretrial punishment. (*Bell* v. *Wolfish, supra*, at p. 535 [60 L.Ed.2d at p. 465].) "'Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." [Citations.] Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees. [Citation.] ... Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial .... [T]he effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment.'" (*In re Smith, supra*, 112 Cal.App.3d 956, 965, quoting *Bell* v. *Wolfish, supra*, 441 U.S. 520, 538-540 [60 L.Ed.2d 447, 467-469].)

However, we are persuaded, as was the court in *Molar v. Gates, supra*, 98 Cal.App.3d 1, that *Bell v. Wolfish* does not stand for the proposition that lawful incarceration alone justifies limitations on the constitutional equal protection rights of female jail inmates in California. As Justice Tamura wrote for a unanimous court in *Molar v. Gates, supra*, at pages 21 and 22, footnote 13: "Defendants cite a recent Supreme Court case, *Bell v. Wolfish* [citation], for the proposition that lawful incarceration justifies limitations on the constitutional rights of prisoners, including the equal protection rights of female jail inmates. *Bell*, however, deals with the rights of pretrial detainees versus those of sentenced prisoners, rather than those of female versus male inmates which are entitled to a higher level of scrutiny. Moreover, *Bell* mandates *equal* treatment to promote prison security instead of condoning *unequal* treatment. [Italics in original.]"

A condition of confinement which does not constitute punishment or impinge upon a fundamental right or equal protection of the law will pass constitutional muster if it is rationally related to a legitimate governmental interest.

██ However, any differences in privileges or treatment of inmates which result from classification based upon sex are to be treated as "suspect" under the equal protection provisions of the California Constitution, article I, section 7, which provisions "are 'possessed of independent validity' from the Fourteenth Amendment so that a decision based upon a determination that the equal protection guaranteed by the state Constitution has been violated will stand on that state ground alone. [Citations.]" (*Molar v. Gates, supra*, 98 Cal.App.3d at p. 12.) Such sex based classification and difference in treatment in transportation to court, access to outdoor recreation areas, and contact visits may only be justified by respondents showing a compelling governmental interest in such classification and treatment of the inmates, and are to be strictly scrutinzed by the court. (*Id.*, at p. 16.) "Administrative convenience," i.e. that it is bureaucratically efficient to provide services or conditions of confinement or court transportation through such classification, cannot justify a suspect classification in the face of this strict scrutiny test. Budgetary considerations may not be used to exclude female inmates from the equal protection of the law or to restrict their fundamental rights, regardless of the number involved, nor must women wait for rights or privileges equal to male inmates until additional funds are available. (*Molar v. Gates, supra*, at pp. 16-18.)

However, in requiring an end to any alleged equal protection violation, the court may consider relative financial as well as social "costs" in weighing alternative approaches to a solution. (See *Crawford* v. *Board of Education* (1976) 17 Cal.3d 280, 309-310 [130 Cal.Rptr. 724, 551 P.2d 28]; *Molar* v. *Gates, supra*, 98 Cal.App.3d at p. 17, fn. 11; *Young* v. *Gnoss* (1972) 7 Cal.3d 18, 28 [101 Cal.Rptr. 533, 496 P.2d 445].)

## III. OUTDOOR RECREATION

At the time of the trial, pretrial detainees were permitted out-of-doors for four 1-hour periods each week in two 4,000 square foot recreation areas covered with asphalt and equipped with a combination badminton-volley ball court, a ping pong table, and two circular tables with umbrellas and benches. Sentenced prisoners were permitted to go out-of-doors for two 1-hour periods each week in a 40,950 square foot area, partially covered with grass. Subsequent to trial, both pretrial and sentenced prisoners were permitted outdoor recreation twice a week for over an hour each time in the large recreation area. Maximum security inmates, except those on discipline, were permitted the same opportunity for outdoor recreation, but in the smaller, more secure recreational area.

Inmates at four men's detention camps operated by Los Angeles County and at the California Institution for Women, a prison facility operated by the State of California for sentenced felons, were allowed daily access to the out-of-doors. The trial court held that although the former practice of SBI was not sufficiently justified by legitimate governmental interests, the subsequent practice was so justified and did not deny inmates equal protection of the law.

■ Appellants contend that the trial court committed reversible error in permitting the reduction of outdoor time, that the present practice constitutes cruel and/or unusual punishment, and that female prisoners' limited access to the out-of-doors is an impermissible form of sex discrimination. The resolution of this issue affects both pretrial detainees and sentenced prisoners. ■ With regard to sentenced prisoners the issue raised by appellants is whether this limitation on outdoor recreation violates the constitutional prohibition against cruel or unusual punishment. In analyzing this issue we must determine whether the challenged condition is compatible with "'the evolving standards of de-

cency that mark the progress of a maturing society.' [Citations.]" (*Wright* v. *Rushen, supra*, 642 F.2d 1129, 1133.)

If the challenged limitation passes that test, the regulation must bear only a rational relationship to a conceivable legitimate governmental purpose in order to be affirmed by this court. (*In re Gatts, supra*, 79 Cal.App.3d 1023, 1029.)

Appellants have directed our attention to a number of federal cases which have concerned themselves with the opportunity for outdoor recreational time to be afforded to sentenced prisoners, but concede that "a precise standard is elusive." After our review of those cases, we conclude that courts considering this issue look to all of the recreational opportunities, not only access to the outdoors. (Cf., e.g. *Spain* v. *Procunier* (9th Cir. 1979) 600 F.2d 189, 199; *Clay* v. *Miller* (4th Cir. 1980) 626 F.2d 345, 347.)

In the case before us, at the time of entry of the judgment, appellants not only had access to outdoor recreation twice a week, but also had "daily access to dayrooms equipped with televisions, games, tables and chairs, weekly movies, scheduled live entertainment programs, education and vocational classes." Under these circumstances we conclude that "the evolving standards of decency that mark the progress of a maturing society" have been met, and that the practice is not unconstitutional, cruel or unusual punishment.

Appellants have not drawn our attention to any evidence which would support the inference that the detention officials had an intent or purpose to punish when they reduced the number of hours during which outdoor recreation was made available to pretrial detainees. It appears from the record that this change was made in order to allow pretrial detainees access to the large outdoor recreation area equal to that afforded to sentenced prisoners. Although we agree with appellants that two hours a week is a "meager opportunity to go out-of-doors," substantial evidence supports the trial court's conclusion that this regulation is sufficiently justified by a legitimate governmental interest. Therefore, it is not unconstitutional under the "punishment" analysis[5] as to either sentenced prisoners or pretrial detainees.

---

[5]Appellants' contention that the regulation denies them equal protection will be discussed further below.

## IV. DISCIPLINARY PROCEDURES

The trial court found that when a deputy believes that a major disciplinary offense, e.g., fighting, insubordination, stealing, gambling, or an accumulation of minor incident reports or demerits, has occurred, the accused inmate is removed to the housing area day room where a supervising deputy decides whether immediate transfer to one of the disciplinary segregation areas is appropriate. The trial court further found that such an immediate transfer occurred only where the security and welfare of the facility staff or inmates might be impaired by allowing the inmate to remain in regular housing.

■ Appellants contend that this finding is erroneous because the uncontradicted testimony of the officer responsible for overseeing disciplinary procedures testified that "prisoners charged with major disciplinary offenses are routinely placed into disciplinary isolation prior to a disciplinary hearing which occurs two to twenty-four hours later." Appellants concede that the SBI policy manual, which was received in evidence, provides that "inmates may be transferred to disciplinary isolation prior to a hearing when security and welfare of the facility so require and that hearings shall be on the next day following an incident." However, they argue that "such policy statements do not resolve the question of actual disciplinary practices," and that the actual practice violates due process of law requirements.

It is the trial court's function to resolve disputed issues of fact. This court's function is confined to a determination of whether substantial evidence supports the trial court's finding of fact after reviewing the conflicting evidence in a light most favorable to respondents and drawing in support thereof all reasonable inference. Our review of the record brings us to the conclusion that there was substantial evidence to support the trial court's finding in this respect.

The policy as set forth in the manual constitutes substantial evidence in support of the trial court's factual finding. If the procedure set forth in the manual is followed, the immediate transfer of an inmate to disciplinary segregation where the security and welfare of the facility staff or inmates might be impaired by allowing the inmate to remain in regular housing does not violate due process requirements so long as the hearing is held within a reasonable time. (*In re Davis* (1979) 25 Cal.3d 384, 392 [158 Cal.Rptr. 384, 599 P.2d 690]; see also *Bickham* v. *Cannon* (7th Cir. 1975) 516 F.2d 885, 886; *Crooks* v. *Warne* (2d Cir.

1975) 516 F.2d 837, 839.) If the procedure set forth in the manual is not followed, the judgment which is required by its terms to be posted where inmates of SBI may read it, provides a means of securing compliance therewith.

## V. Administrative Segregation Procedure

The trial court found that "[c]ontrols are those inmates who are not able to get along in regular housing primarily because of combative or erratic behavior. . . . Some controls are housed in segregated confinement according to the following procedure: a deputy observing the behavior writes a report which is given to the deputy's supervisor; the supervising deputy interviews the inmate and determines the appropriateness of segregation; prior to segregation, the inmate is taken to the infirmary and checked by the medical staff; after segregation, the inmate is seen by the psychiatrist; the segregation of controls is reviewed by the classification board, which talks to the inmate to ascertain if she can be reassigned to regular housing; the classification board abides by the psychiatrist's recommendations after he has seen the inmate." The court concluded that this practice is reasonable and sufficiently justified by legitimate governmental interests.

 Appellants contend that this procedure does not satisfy due process of law requirements, arguing that: (1) they have a justifiable expectation that they will not be deprived of certain jail privileges without good cause; (2) the rules set forth in the SBI Manual provide for assignment to administrative segregation "only if a prisoner is found to be, inter alia, an escape or an assault risk, a prisoner in need of protection or a high security risk"; and (3) control cell block prisoners suffer substantial deprivations, including lockdown in single cells, denial of dayroom and television privileges and denial of outdoor exercise, for a "considerable and indeterminate amount of time."

Respondents argue that "the existing procedures, with several levels of review, verified by medical staff provide adequate checks against erroneous action."

 "[I]dentification of the dictates of due process generally requires consideration of (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the dignitary interest in

informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official, and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*People* v. *Ramirez* (1979) 25 Cal.3d 260, 269 [158 Cal.Rptr. 316, 599 P.2d 622].)

In *Wright* v. *Enomoto* (N.D.Cal. 1976) 462 F.Supp. 397, 403, affd., *Enomoto* v. *Wright* (1978) 434 U.S. 1052 [55 L.Ed.2d 756, 98 S.Ct. 1223], a three-judge district court held that confinement of a prison inmate in maximum security constitutes a "severe impairment of the residuum of liberty which he retains as a prisoner—an impairment which triggers the requirement for due process safeguards." (*Id.*, at p. 402.) It further held that because California has "limited the discretion of the classification committees by statewide regulations .... [¶] [T]he inmate has an interest, conferred by statewide regulation and protected by due process, in not being confined in maximum security segregation unless he is found, for clearly documented reasons, to come within the standard set by the rules." (*Id.*, at pp. 402-403.) Therefore, procedural due process requires that the inmate be afforded a hearing with advance written notice, opportunity to present witnesses and documentary evidence, written reasons for the decision and counsel-substitute for an illiterate inmate in a case with complex issues.

The California Supreme Court extended these requirements to prison inmates placed in administrative segregation because of a pending disciplinary charge in *In re Davis, supra*, 25 Cal.3d 384, 391. Similarly, the First District Court of Appeal extended the requirements to prison inmates prior to a solitary confinement classification in *In re Carr* (1981) 116 Cal.App.3d 962 [172 Cal.Rptr. 417]. ■ "[P]retrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that [the Supreme Court has] held are enjoyed by convicted prisoners." (See *Bell* v. *Wolfish, supra*, 441 U.S. at p. 545 [60 L.Ed.2d at p. 472].)

We recognize that the inmates in the case before us are ordinarily confined to SBI for shorter periods of time than inmates sentenced to prison. That difference becomes less significant in light of the fact that the maximum period of segregation which could be imposed for a disciplinary violation in the *Davis* case was 10 days. (25 Cal.3d at p. 392.)

Nevertheless, the *Davis* court held that the administrative segregation imposed prior to disciplinary segregation, as well as the disciplinary segregation itself, required a hearing in which the safeguards required by *Enomoto* v. *Wright, supra* 434 U.S. 1052 be accorded the inmate. (*In re Davis, supra*, 25 Cal.3d 384.) The reasoning of these cases indicates that appropriate due process safeguards must be afforded the inmates at SBI.

Although the procedures set forth in the SBI policy manual reduce to some extent the risk of an erroneous deprivation of the residuum of liberty retained by prisoners, those procedures are not an adequate substitute for a hearing in which an inmate is allowed to present witness and documentary evidence (provided that to do so would not jeopardize institutional safety or correctional goals). Such witnesses and evidence may be more effective in challenging the facts upon which the original report is based than could the testimony of the affected inmate alone. (See *Vitek* v. *Jones* (1980) 445 U.S. 480, 490-491 [63 L.Ed.2d 552, 563-564, 100 S.Ct. 1254]; *O'Bryan* v. *County of Saginaw, Mich.* (E.D. Mich. 1977) 437 F.Supp. 582, 601.)

Implementation of the procedures set forth in *Wright* v. *Enomoto, supra*, 462 F.Supp. 397, and *In re Carr, supra*, 116 Cal.App.3d 962, will undoubtedly place some greater administrative burdens on respondents than they concede is the existing procedure. However, this factor does not outweigh "the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official." (*People* v. *Ramirez, supra*, 25 Cal.3d at p. 269.) In order to afford the procedural due process mandated by *People* v. *Ramirez, supra, Wright* v. *Enomoto, supra*, 462 F.Supp. 397, and the California Minimum Jail Standards, 15 California Administrative Code section 1000 et seq. (in regard to administrative segregation, which standards were established pursuant to Pen. Code, § 6030) we conclude that the judgment of the trial court must be modified with regard to the placement of inmates in administrative segregation in order to afford such inmates (1) a hearing with advance written notice (except in case of a genuine emergency) before initial placement of inmates in administrative segregation, (2) the opportunity to present witnesses and documentary evidence, (3) written reasons for the decision and (4) counsel-substitute for an illiterate inmate or in a case with complex issues.

## VI. Court Transportation Procedures, Telephone Access and Visitation Policies

The trial court held reasonable and justified by sufficient legitimate governmental interests the following procedures and policies:

1. The awakening of all prisoners, including the 20 to 25 percent who were going to court, at 4:30 a.m. in the morning, where most of the prisoners who had court appearances were usually returned to SBI by 6 p.m., although some occasionally returned on a late bus as late as 8 or 8:20 p.m. and reached their housing areas 45 to 50 minutes after their arrival at SBI.

2. Access to telephones by means of a signup procedure on a rotation basis which "permits approximately 250 inmates a day access to the telephones and permits access to the telephones at least every other day, on the average, in addition to what access to phones inmates obtain when they are booked and when they go to court."

3. The denial of "contact" visits, in which inmates are allowed to touch members of their family.

Appellants contend that the first conclusion is erroneous as to pretrial detainees and that the second and third are erroneous as to both pretrial detainees and sentenced inmates.

With the exception of the modification of the judgment required with regard to administrative segregation, our review of the record leads us to conclude that there was substantial evidence under the requisite applicable standards we have set forth above to support the trial judge's findings and conclusions on each of the issues and his judgment at the time it was entered on December 6, 1978.

### Equal Protection and the Charges of Gender Based Differentials

Appellants request us to reverse the judgment of the trial court on the issues of processing to court, contact visitation, outdoor recreation, access to telephones, disciplinary due process, procedures for placement of prisoners into "control" and attorneys' fees under 42 United States Code section 1988. They urge that we instruct the superior court

to conduct further hearings and issue further and more appropriate relief.

With respect to the issues other than attorneys' fees, appellants request us to remand to the superior court as they contend that a decision of the federal court affecting inmates of the Los Angeles County jail for men which was filed after the judgment in this case, compels a result different than that reached by the trial court herein.

In *Rutherford* v. *Pitchess* (C.D.Cal. 1978) 457 F.Supp. 104, a class action brought on behalf of prisoners confined at Los Angeles County central jail, the United States District Court for the Central District of California held, inter alia, that pretrial detainees confined in that institution were constitutionally entitled to: (1) the opportunity to sleep between the hours of 8 p.m. and 6 a.m. on days they were in trial; (2) the opportunity to make at least one telephone call per day; and (3) under certain conditions, a limited number of "contact" visits during which they are allowed to touch members of their family; and (4) the opportunity for not less than two and one-half hours of exercise per week with the goal of increasing that amount to one hour per day. (457 F.Supp. at pp. 110, 111, 115, 116.)

At appellants' request we take judicial notice of the judgment in that case, filed February 15, 1979, after the entry of judgment herein, and at respondents' request we also take judicial notice that that judgment was modified in certain respects on October 20, 1981. That modification occurred after the defendants in that case requested reconsideration based upon the statement of a judge of the Los Angeles Superior Court in which he set forth "the interference with the proper operation of [that Court] caused by the implementation of [the Federal] Judge Gray's order ... in *Rutherford*."

The trial court concluded on the basis of the evidence presented at trial that, except for certain conditions it ordered changed, "difference in treatment between female and male inmates within the County of Los Angeles County jail system is reasonable and justified by legitimate governmental interests." Substantial evidence supported that conclusion.[6] Strict scrutiny of the entire record leads us to conclude that

---

[6]Appellants presented evidence concerning the differences in procedures regarding contact visits and access to telephones at California Institution for Women, a state prison, and at four detention facilities for men operated by Los Angeles County. The evidence demonstrated that each of these facilities housed inmates under substantially different physical conditions from those existing at SBI.

the trial court's findings and conclusions were also supported at the time they were made and at the time the judgment was entered by a compelling governmental interest.

Appellants request that we instruct the superior court to conduct further hearings and issue further and more appropriate relief, on the basis, among others, of the changes implemented or required in the men's and women's jail facilities since *Rutherford* became final and since the judgment was entered in this case. The conflicting allegations made in the respective briefs of the parties, however, as to what changes have and have not been made at Los Angeles County central jail and at SBI since the judgment was entered below illustrates the wisdom of our not doing so.[7] This court must decide upon the basis of the record before it on appeal together with the matters of which we have taken judicial notice pursuant to the request of the parties, not merely upon unsupported allegations in briefs.

We note further that since the judgment was entered herein no party has sought a modification of it in the superior court on the basis of the alleged changed facts since entry of judgment, or in light of *Rutherford*. The trial court, however, has the inherent power to vacate or modify an injunction where there has been a change in the law or the facts or "where there the ends of justice would be served by modification." (See *Sontag Chain Stores Co.* v. *Superior Court* (1941) 18

---

[7]Footnotes 5 on page 3 of respondents' brief and 38 and 39 at page 20 of that brief is illustrative of this conflict. They read as follows:

"38 In the appellants opening brief, appellants incorrectly describe the 4:30 a.m. time as the current wake-up time (appellants' opening brief, p. 7). Although it is not in the record, the wake-up time for all inmates, including those going to court, is now between 5:30 and 5:45. Although not in the record, this is the result of orders in another case, and the voluntary agreement of most courts to rearrange their calendars to accommodate later appearances of in custody defendants. Although not in this record, this information is largely contained in the subsequent unreported proceedings in *Rutherford* v. *Pitchess*, U.S.D.C. No. CV-75-4111-WPG.

"39. Although it is not in the record, having been modified since the time of trial, this time is now later, as is the wake-up time. See note 38. The bus now leaves S.B.I. at about 7 a.m."

Footnote 5 on page 3 of respondents' brief reads in part as follows: "Meetings with state trial judges, together with orders in Rutherford have permitted the later awakening of all inmates, male and female, going to court. Female inmates are now awakened at 5:50 [*sic*] to 5:45 a.m., rather than the former 4:30 a.m.

"Should any departure from this conceded practice of awakening all inmates in the jail system, female and male, who are going to court for trial, at any time earlier than 5:30 to 5:45 a.m., this is a matter which may be brought to the attention of the trial court."

Cal.2d 92, 95 [113 P.2d 689], where changed circumstances consisted of a subsequent court decision which would have allowed the peaceful picketing enjoined by the trial court.) The modification powers of the trial court also extend to situations where there has been a change in the facts or the law so as to require the issuance of an injunction previously denied. (*Brunzell Constr. Co. v. Harrah's Club* (1967) 253 Cal.App.2d 764, 772-773 [62 Cal.Rptr. 505].)

The trial court is the proper court in which to seek such modification on the basis of such changes as have occurred since the date of entry of the judgment.

## VII. ATTORNEYS FEES

### A. Facts

The trial court found that plaintiffs had vindicated rights guaranteed by the United States Constitution to the benefit of a substantial group of persons and awarded attorneys' fees in the amount of $105,760 under the private attorney general theory. (Code Civ. Proc., § 1021.5.) Of that amount of attorneys' fees awarded $3,918 was attributable to time spent litigating the attorneys' fees. The court held that these attorneys' fees were not recoverable under 42 United States Code section 1988.

Plaintiffs initially filed a bill for $491,594.75. Defendants filed a motion to tax costs contending, inter alia, that all fees should be denied, or if awarded, should be limited to $25,000. Plaintiffs' attorneys then filed declarations summarizing the time expended by them to be 2,745 hours and requested compensation at the rate of $100 per hour times a multiple of 1.5 "to reflect the 'quality of the results.'" The trial court reduced the number of compensable hours to 2,461 and established rates of compensation for the six attorneys ranging from $50 to $70 per hour and applied a multiplier of .67 to reflect plaintiffs' failure to prevail on medical issues.

### B. Contentions

Plaintiffs contend that the trial court erred in not awarding fees pursuant to 42 United States Code section 1988. However, they have made no attempt to demonstrate prejudice as a result of this ruling, i.e. they do not contend that the award for attorneys fees would have been great-

er had fees been awarded pursuant to that section. Therefore, we need not address ourselves to that issue.[8]

▮ Defendants, in a cross-appeal, contend that:

1. An award of attorneys' fees should not include compensation for efforts expended on the application for attorneys' fees, unless there exist special circumstances that would make a denial of such additional fees unjust.

2. Not only are there no special circumstances in the present action that warrant reimbursement for efforts expended on the application for attorneys' fees, but the particular circumstances of this action make the inclusion of compensation for such efforts particularly inappropriate.

DISCUSSION

Our research on this issue has revealed no California case directly on point,[9] and a split of authority in federal cases considering the issue in similar contexts. (See, e.g. *Rosenfeld* v. *Southern Pacific Company* (9th Cir. 1975) 519 F.2d 527, 530-531; *In re Equity Funding Corp. of America Securities* (C.D.Cal. 1977) 438 F.Supp. 1303, 1330, fn. 6.)

However, we find persuasive the case of *Rich* v. *City of Benicia* (1979) 98 Cal.App.3d 428, 438 [159 Cal.Rptr. 473], in which the appellate court allowed attorneys' fees on appeal where the only issues raised concerned the propriety of fees awarded to plaintiff on a "private attorney general" theory.

The "private attorney general theory . . . 'seeks to encourage suits effectuating a strong congressional or national policy by awarding substantial attorney's fees, regardless of defendants' conduct, to those who successfully bring such suits and thereby bring about benefits to a broad class of citizens.'" (*Serrano* v. *Priest* (1977) 20 Cal.3d 25, 43

---

[8]"Whether [42 U.S.C. § 1988] applies to suits prosecuted in California courts is questionable, particularly in view of the existence of [Code Civ. Proc.] section 1021.5. [Citations.]" (*Adler* v. *Los Angeles Unified School Dist.* (1979) 98 Cal.App.3d 280, 290, fn. 11 [159 Cal.Rptr. 528].)

[9]The issue is presently pending before the California Supreme Court in *Serrano* v. *Unruh*▮ (Cal.App.).

[141 Cal.Rptr. 315, 569 P.2d 1303], quoting from *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 27 [112 Cal.Rptr. 786, 520 P.2d 10].)

We believe this concept has been given full effect by the award of attorneys' fees in this case.

"The 'experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.' [Citations.]" (*Serrano* v. *Priest, supra*, 20 Cal.3d at p. 49.) We find no abuse of discretion here.

The judgment is modified as follows:

With regard to placement of an inmate in administrative segregation: Except in case of a genuine emergency no inmate shall be placed in administrative segregation without first being afforded a hearing by a disinterested governmental official, advance written notice, the opportunity to present witnesses and documentary evidence when it will not be hazardous to institutional safety, a written decision with written reasons for that decision, counsel-substitute (either a fellow inmate or a member of the SBI staff) to help prepare her defense, if she is illiterate or the reason claimed for such administrative segregation involves complex issues. In the event of a genuine emergency, such hearing shall take place as soon as is reasonably practical and in no event more than 72 hours after the cessation of such emergency.

As so modified the judgment is affirmed.

Woods, Acting P. J., and Files, J.* concurred.

Petitions for a rehearing were denied April 14, 1982, and the petition of plaintiffs and appellants for a hearing by the Supreme Court was denied July 14, 1982. Bird, C. J., and Newman, J., were of the opinion that the petition should be granted.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.